DeWitt EASTER, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 19365.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 19, 1966.

Decided March 31, 1966.

Messrs. Peter Barton Hutt and Michael
S. Horne, Washington, D. C., with whom
Messrs. Monroe H. Freedman, James V.
Siena and Frank S. Ketcham, Washing-
ton, D. C., were on the brief, for appel-
lant.

Mr. Ted D. Kuemmerling, Asst. Cor-
poration Counsel for the District of Col-

umbia, with whom Messrs. Milton D. Korman, Acting Corporation Counsel, and Hubert B. Pair, Asst. Corporation Counsel, were on the brief, for appellee.

Before BAZELON, Chief Judge, and FAHY, DANAHER, BURGER, WRIGHT, MC-GOWAN, TAMM and LEVENTHAL, Circuit Judges, sitting *en banc.*

FAHY, Circuit Judge, with whom BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges, join and with whom McGOWAN, Circuit Judge, joins in the result and in Parts I and III of the opinion:

In the Court of General Sessions of the District of Columbia, at a trial by a judge without a jury, appellant DeWitt Easter was found guilty of having been "drunk and intoxicated" on a stated date in a street in Washington, in violation of our Code provision reading:

No person shall * * * be drunk or intoxicated in any street, alley, park, or parking; * * *

D.C. Code § 25–128(a).[1] He was given a suspended sentence of ninety days imprisonment. That he was drunk or intoxicated at the time and place stated was proved and was uncontested. His defense was that he was a chronic alcoholic.

The judge did not rule that the evidence fell short of establishing that appellant was a chronic alcoholic. The judge ruled that the evidence to that effect was not pertinent; that is, that chronic alcoholism was not a defense to a charge of intoxication in a public place.

The District of Columbia Court of Appeals affirmed the conviction. Easter v. District of Columbia, D.C.App., 209 A.2d 625. We allowed an appeal to this court. Sitting en banc we heard and now decide the case.

I

Our decision is that chronic alcoholism is a defense to a charge of public intoxication and, therefore, is not a crime in violation of Section 25–128(a) of our Code, *supra* n. 1. We think this follows, in the first place, from the Act of Congress of August 4, 1947, entitled "Rehabilitation of Alcoholics," 61 Stat. 744, c. 472, now embodied in our Code as Sections 24–501 et seq.[2]

In aid of its purposes, one of which is "to establish a program for the rehabilitation of alcoholics, promote temperance, and provide for the medical, psychiatric, and other scientific treatment of chronic alcoholics" the Act provides,

the courts of the District of Columbia are hereby authorized to take judicial notice of the fact that a chronic alcoholic is a sick person and in need of proper medical, institutional, advisory, and rehabilitative treatment, and the court is authorized to direct that he receive appropriate medical, psychiatric, or other treatment as provided under the terms of this chapter.[3]

D. C. Code § 24–501 (1961 ed.).

---

1. D.C.Code § 25–128 (1961 ed.):
   (a) No person shall in the District of Columbia drink any alcoholic beverage in any street, alley, park, or parking; * * * No such person shall be drunk or intoxicated in any street, alley, park, or parking; * * *.

2. The full flavor of the enlightened treatment of the subject by Congress, demonstrating its intention that the chronic alcoholic be subjected to civil processes when found intoxicated in public, rather than convicted as a criminal, can be gathered only by perusal in full of the Act of 1947.

3. § 24–509 provides:
   Certification of adequate facilities.
   No chronic alcoholic shall be committed to a clinic, agency, hospital, or institution under the terms of this chapter until the District Commissioners shall certify to the municipal court for the District of Columbia the extent to which proper and adequate treatment facilities and personnel have been provided to carry out the purposes of this chapter.

   It is not shown that the Commissioners have made this certification; but we are concerned with those provisions of the Act which bear upon the legal question before us. Their effect upon that question cannot be avoided because the facilities contemplated by other provisions of the Act may not be available

A "chronic alcoholic" is defined in the Act:

> The term "chronic alcoholic" means any person who chronically and habitually uses alcoholic beverages to the extent that he has lost the power of self-control with respect to the use of such beverages, or while under the influence of alcohol endangers the public morals, health, safety, or welfare.

D.C. Code § 24–502 (1961 ed.).

We are concerned in this case only with that part of the above definition which refers to loss of the power of self-control with respect to the use of alcoholic beverages.

▇▇▇ The above statutory provisions, considered in the full context of the Act of which they are a part,[4] preclude attaching criminality in this jurisdiction to intoxication in public of a chronic alcoholic. An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. Action within the definition is not enough. To be guilty of the crime a person must engage responsibly in the action. Thus, an insane person who does the act is not guilty of the crime. The law, in such a case based on morals, absolves him of criminal responsibility. So, too, in case of an infant. In case of a chronic alcoholic Congress has dealt with his condition so that in this jurisdiction he too cannot be held to be guilty of the crime of being intoxicated because, as the Act recognizes, he has lost the power of self-control in the use of intoxicating beverages. In his case an essential element of criminality, where personal conduct is involved, is lacking. This element is referred to in the law as the criminal mind. See Carter v. United States, 102 U.S.App.

D.C. 227, 235, 252 F.2d 608, 616, where the subject is well discussed. It is there stated in terms of the common-law axiom, *"Actus non facit reum, nisi mens sit rea."* Coke, Third Institute *6, *107.

The Act of 1947 does not state that a chronic alcoholic is suffering from a mental disease which causes the loss of control; the defense is not in terms of insanity. The condition is defined as a "sickness," and Congress did not find it necessary to specify whether it is mental, physical or a combination of both. Whatever its etiological intricacies it is deemed a sickness which is accompanied with loss of power to control the use of alcoholic beverages. The congressional judgment is supported not only by the evidence in this case adduced in the Court of General Sessions but by the record of the hearings on the Act of 1947,[5] the entire legislative history of the Act, and by an additional abundance of authorities, some of which are enumerated in Appendix B to this opinion. As Congressman Miller of Nebraska stated on the floor of the House during the debate on the Act:

> Jail is not the answer to their trouble. We think they are sick people and need scientific and technical attention of psychiatrists and medical personnel.

93 Cong.Rec. 3357 (1947).[6]

It is suggested that the public nature of the intoxication adds a factor which precludes the defense—that if suffering from the sickness is not a crime manifesting it in a public place is. But nothing whatever indicates that Congress intended to limit the scope of the Act to persons sick in privacy. It is clear the Act was primarily concerned with persons found in public places. The provisions which contemplated their institutional care, instead of the jail, show indubitably

---

4. "The purpose of this chapter is * * * to substitute for jail sentences for drunkenness medical and other scientific methods of treatment which will benefit the individual involved and more fully protect the public." D.C.Code § 24–501 (1961 ed.).

5. Portions of the Hearings are set forth in Appendix A to this opinion.

6. Our reliance upon the Act of 1947, and the independent support for its conclusion that the chronic alcoholic lacks the criminal mind and, therefore, is not guilty of a crime in being intoxicated in a public place, is a separate basis for our decision independent of reliance upon the Eighth Amendment, hereinafter discussed.

that the non-criminal approach of Congress applied to the chronic alcoholic floundering in a public place. The lack of power of self-control referred to cannot be limited to absolution of criminality for drinking or being drunk in a non-public place. No statute in the District of Columbia makes such an act or circumstance criminal. The very nature of the sickness goes where its victim goes.

It should be clear from the above that chronic alcoholism resulting in public intoxication cannot be held to be criminal on the theory that before the sickness became chronic there was at some earlier period a voluntary act or series of acts which led to the chronic condition. A sick person is a sick person though he exposed himself to contagion and a person who at one time may have been voluntarily intoxicated but has become a chronic alcoholic and therefore is unable to control his use of alcoholic beverages is not to be considered voluntarily intoxicated. We desire to make clear, however, that we are not absolving the voluntarily intoxicated person of criminal responsibility for crime in general under applicable law. See Harris v. United States, 8 App.D.C. 20, 36 L.R.A. 465.

We find no basis for judicial repudiation of the Act of 1947. The fact that in the intervening years the facilities contemplated by the Act have not been made available does not detract from the legal effect of those provisions of the Act which define the nature of the sickness. One who has committed no crime cannot be validly sentenced as a criminal because of a lack of rehabilitative and caretaking facilities.

In event of a determination of chronic alcoholism under the procedures of D.C.Code § 24-504 commitment for treatment is not mandatory. In the judge's discretion the accused may be released. But he may not be punished.

II

Our decision would be the same were we without the guidance furnished by the Act of 1947. One who is a chronic alcoholic cannot have the *mens rea* necessary to be held responsible criminally for being drunk in public. This is so for the same reason which led Congress to that enactment, namely, that a chronic alcoholic is in fact a sick person who has lost control over his use of alcoholic beverages. This is demonstrated by the hearings on the Act of 1947, by the evidence taken in the present case, and by the wealth of material available and appropriate to be considered by the court. See Appendices A and B.

The same basic problem now before us was recently before the Court of Appeals for the Fourth Circuit in Driver v. Hinnant, 356 F.2d 761.[7] This was a habeas corpus proceeding attacking in the federal courts a conviction of Driver of public intoxication by the courts of North Carolina. Under a State statute it was a misdemeanor to be found "drunk or intoxicated on the public highway, or at any public place or meeting." Even without benefit of such a statute as our Act of 1947, the court sustained the defense of chronic alcoholism. The court said in part:

> As defined by the National Council on Alcoholism, he [a chronic alcoholic] is a "person who is powerless to stop drinking and whose drinking seriously alters his normal living pattern."[1]

[1.] Public Health Service Publication, No. 730, "Alcoholism", prepared by the National Institute of Mental Health, National Institute of Health, U. S. Department of Health, Education and Welfare (1965).

The American Medical Association defines "alcoholics" as "those excessive drinkers whose dependence on alcohol has attained such a degree that it shows a noticeable disturbance or interference with their bodily or mental health, their interpersonal relations,

[7.] Opinion by Circuit Judge Bryan, concurred in by Circuit Judge Bell and District Judge Maxwell.

and their satisfactory social and economic functioning".[2]  The World

2. See fn. 1.

Health Organization recognizes alcoholism "as a chronic illness that manifests itself as a *disorder of behavior*".[3]

3. See fn. 1.  Chief Judge Butler noted below, 243 F.Supp. 95, 97, and followed the definition of Congress appearing in the District of Columbia Code, § 24–502, that a chronic alcoholic is "any person who chronically and habitually uses alcoholic beverages to the extent that he has lost the power of self-control with respect to the use of such beverages."

(Accent added.)  It is known that alcohol can be addicting,[4] and it is the ad-

4. See fn. 1.

dict—the involuntary drinker—on whom our decision is now made.[5]

5. See Justice Clark dissenting in Robinson v. [State of] California, 370 U.S. 660, 684 [82 S.Ct. 1417, 8 L.Ed.2d 758] (1962).

Hence we exclude the merely excessive —steady or spree—voluntary drinker.

This addiction—chronic alcoholism— is now almost universally accepted medically as a disease.[6]  The symptoms,

6. Of the myriad authorities these citations will suffice: 2 Cecil and Loeb, A Textbook of Medicine, at 1625 (10th ed. 1959); Manfred S. Guttmacher and Henry Weihofen, Psychiatry and The Law, at 318–322 (1952 ed.); Jellinek, The Disease Concept of Alcoholism, at 41–44 (1960).

as already noted, may appear as "disorder of behavior".  Obviously, this includes appearances in public, as here, unwilled and ungovernable by the victim.  When that is the conduct for which he is criminally accused.  There can be no judgment of criminal conviction passed upon him.  To do so would affront the Eighth Amendment, as cruel and unusual punishment in branding him a criminal, irrespective of consequent detention or fine.[7]

7. See concurring opinion of Justice Douglas in Robinson v. State of California, supra, 370 U.S. 660, 676 [82 S.Ct. 1417, 1425, 8 L.Ed.2d 758].

Although his misdoing objectively comprises the physical elements of a crime, nevertheless no crime has been perpetrated because the conduct was neither actuated by an evil intent nor accompanied with a consciousness of wrongdoing, indispensable ingredients of a crime.  Morissette v. United States, 342 U.S. 246, 250–252, 72 S.Ct. 240, 96 L.Ed. 288 (1952).  Nor can his misbehavior be penalized as a transgression of a police regulation—malum prohibitum—necessitating no intent to do what it punishes.  The alcoholic's presence in public is not his act, for he did not will it.  It may be likened to the movements of an imbecile or a person in a delirium of a fever.  None of them by attendance in the forbidden place defy the forbiddance.

\*   \*   \*   \*   \*   \*

Of course, the alcohol-diseased may by law be kept out of public sight. Equally true, the North Carolina statute does not punish them solely for drunkenness but rather for its public demonstration.  But many of the diseased have no homes or friends, family or means to keep them indoors.  Driver examples this pitiable predicament, for he is apparently without money or restraining care.

Footnote 3 of Judge Bryan's opinion calls attention to reliance by the District Court in the *Driver* case upon the definition of a chronic alcoholic contained in the Act of 1947.

Judge Bryan also stated for the court that Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, "sustains, if not commands, the view we take."  In *Robinson* the Supreme Court held invalid as cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments a California statute which made drug addiction a crime.  The Court said such addiction was a status involuntarily assumed, and therefore to punish it as a crime violated the constitutional provisions.  Since, as we have seen, public intoxication of a chronic alcoholic is not a crime, to convict one of it as though it were would also be cruel and

unusual punishment. The fact that in our case the sentence of 90 days was suspended, whereas in *Robinson* there was imprisonment, is immaterial on the question of cruel and unusual punishment; it is the fact of criminal conviction that is critical:

> * * * in the light of contemporary human knowledge, a law which made a criminal offense of such a disease [mental illness, leprosy, or venereal disease] would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[8] 370 U.S. at 666, 82 S.Ct. at 1420.

In *Driver* Judge Bryan stated it is "cruel and unusual punishment in branding him a criminal, irrespective of consequent detention or fine."

We hold, therefore, by reason of the Act of 1947, for the independent reasons which underlay the theory of that Act, and on the precedential authority of *Driver*,[9] with support also from *Sweeney*, n. 9 *supra*, that the public intoxication of a chronic alcoholic lacks the essential element of criminality; and to convict such a person of that crime would also offend the Eighth Amendment.

We close this discussion with the observation that confinement, e. g. for inquiry or treatment, lies within the means available for dealing, constitutionally, with a menace to society. This appears from passages in Robinson v. State of California, *supra*, 370 U.S. at 664–665, 82 S.Ct. 1417; Driver v. Hinnant, *supra*. We are not called upon to speculate as to the range and nature of permissible detention which could be authorized by Congress beyond that contemplated in the Act of 1947.

### III

It follows that the evidence of chronic alcoholism adduced in this case was pertinent. It established the defense.

██ Expert medical and psychiatric evidence, not sought to be rebutted, proved that appellant was a chronic alcoholic who had lost self-control over his use of alcoholic beverages. His condition, with its usual physical manifestations, was arrayed fully before the trial judge and need not be repeated here in detail. Since 1937 appellant has been arrested for intoxication or associated conduct 70 times, 12 times in 1963 alone. On innumerable occasions he has been intoxicated but not arrested. The condition had progressed for many years, definitely since the 1930s, resulting in a broken home life, recurrent hospitalization, and loss of steady employment.

---

8. We are referred to cases decided by this court in which narcotic addiction has been discussed in the majority and concurring opinions. These opinions bear upon rights of a narcotic addict in defending charges of having violated the narcotic laws. Hutcherson v. United States, 120 U.S. App.D.C. 274, 345 F.2d 964; Castle v. United States, 120 U.S.App.D.C. 398, 347 F.2d 492; Heard v. United States, 121 U.S.App.D.C. 37, 348 F.2d 43. Several of the opinions discuss the implications of *Robinson* as possibly barring punishment of such an addict charged with violating certain provisions of the narcotic laws, and, also, the relation of narcotic addiction to mental disease as a defense due to the addict's lack of responsibility for the conduct involved. Whatever impact if any our present decision has upon these problems in a narcotic case must be left for such a case. In this case, as we have said, the defense of chronic alcoholism to a charge of public intoxication is not rested upon mental disease as relieving of criminal responsibility, but upon the absence of responsibility incident to the nature of this particular sickness as set forth by Congress and as shown also by the learning upon which Congress relied. It is rested in addition upon the reasoning of the Fourth Circuit and the studies of the problem in relation to criminal responsibility referred to there.

9. And see Sweeney v. United States, 353 F.2d 10 (7th Cir.), where, also relying upon *Robinson*, it is held that a probation condition that the probationer " 'refrain from the use of alcoholic beverages in any form, and * * * support his children to the best of his ability.' * * * would be unreasonable as impossible if psychiatric or other expert testimony was to establish that petitioner's alcoholism has destroyed his power of volition and prevented his compliance with the condition." 353 F.2d at 11. (Footnote omitted.)

Reversed, with direction to remand to the Court of General Sessions for dismissal of the information.

## APPENDIX A

Excerpts of Testimony from Hearings on H.R. 496 before Subcommittee on Health, Education, Recreation of the House Committee on the District of Columbia, 80th Cong., 1st Sess. (1947).

"Chronic alcoholism is a disease. It is one which requires treatment and attention just as the narcotic habit demands treatment." (p. 3)

—Congressman Miller, of Nebraska.

"This is not a measure to approach the moral aspects of drinking, nor is this an opinion as to the drinking of alcoholic beverages, but we are approaching the problem from the standpoint of a man suffering from a disease such as cancer, tuberculosis, or like diseases which also have an economic influence on the lives of our people." (p. 5)

—Congressman Hébert, of Louisiana.

"On a certain day last week, in which we had in our institution [the D.C. penal institution] 559 inmates, that is people committed for intoxication, 5 percent had been committed 100 times or over before; 64 percent of these people in our institution had served time 10 times or more; only 1 of the 559 had been there only once, and so on. * * * In other words, the drink problem in terms of those who get arrested and convicted is primarily a problem of recidivism." (p. 9)

—Donald Clemmer, Director, Department of Corrections, District of Columbia.

"Our hearts and minds particularly go out to those individuals. We know they are derelicts, many of them, practically hopelessly involved in this alcoholic confusion.

\* \* \* \* \* \*

"We are hopeful a bill of this character will no doubt in the case of many men do a great deal of good. I would say if we got 5 percent out of these alcoholic cases restored to normal health and good citizenship, it will have been well worth the effort put forth in this Congress, I am sure. It is perfectly obvious that it will reduce our work, be for the interest to the individual, it being for his protection; \* \* \*." (p. 30)

—Inspector Walter H. Thomas, Acting Major and Superintendent, Metropolitan Police, District of Columbia.

"Through my experience I have been educated as it were to the point that your committee has arrived at, that alcoholism is a disease and that it is not criminal behavior, and that progress in meeting the situation cannot be made, in my mind, unless we break down in its entirety the concept that the alcoholic is a criminal." (p. 41)

—Judge Fay Bentley, Juvenile Court, District of Columbia.

And see the testimony before the Subcommittee of Dr. Robert H. Felix, Chief, Mental Hygiene Division, U. S. Public Health Service, Captain Rhoda Milliken, Head of Women's Division, Metropolitan Police Force, D. C., and others.

## APPENDIX B

Report of the Board of Trustees of the AMA, 162 Jour. of the Am.Med. Ass'n 749 (1956).

"Among the numerous personality disorders encountered in the general population, it has long been recognized that a vast number of such disorders are characterized by the outstanding sign of excessive use of alcohol. All excessive users of alcohol are not diagnosed as alcoholics, but all alcoholics are excessive users. When, in addition to this excessive use, there are certain signs and symptoms of behavioral, personality and physical disorder or of their development, the syndrome of alcoholism is achieved. The intoxication and some of the other possible complications manifested in this syndrome often make treatment difficult. However, alcoholism must be regarded as

within the purview of medical practice." (p. 750)

Trotter, An Essay, Medical Philosophical, and Chemical, on Drunkenness (2d ed. 1804).

*"The habit of drunkenness is a disease of the mind."* (p. 179)

But others think that it is physical and must be slowly dropped since it has become a "part of our nature." (p. 181)

Committee on Prisons, Probation and Parole in the District of Columbia, Report (1957).

"Alcoholism is a serious problem in the District of Columbia." (p. 83)

"Repeaters accounted for 9,288, or 68 per cent, of the total number of arrests. Police records reveal, moreover, that the average person arrested for intoxication during the test period had *a record of 12 prior arrests for the same offense."* (p. 93)

"More than 90 per cent of the 16,267 persons committed to the District Jail for intoxication during fiscal 1956 had served prior prison terms for the same offense. Many who were discharged from the Workhouse on Monday, reappeared for another term before the week was up. The Committee believes that anything more futile than this process of getting drunk, being arrested, receiving 10, 15, or 30-day sentences, going to the Jail and to the Workhouse serving time, going out and getting drunk again, can scarcely be imagined. The rate of recidivism, moreover, is the best evidence that existing procedures are failing to rehabilitate the alcoholic." (p. 102)

"The Committee cannot emphasize too strongly that not all persons committed for intoxication are chronic alcoholics. Many are relatively youthful offenders who were simply intoxicated at the time of arrest; a somewhat larger group are 'problem drinkers,' bordering on chronic alcoholism—but who have families, job prospects, and a desire to 'get back home and back to work'; finally, the great majority of the approximately 14,000 intoxicants committed each year to the Workhouse are chronic skid-row alcoholics.

"Most of the intoxicants in the first two groups should be handled, in any future program, in such a manner as to avoid incarceration. * * *

"However, the vast majority of offenders are chronic skid-row alcoholics who are primarily 'custody cases.' A great number are sick, infirm, and mental cases." (p. 103)

Haggard and Jellinek, Alcohol Explored (1942).

"It is necessary to recognize that the confirmed inebriate is a person requiring medical attention, and society must face the issue of treating him as an irresponsible individual until he can be rehabilitated. * * * It is clear that courts require the aid of medical agencies in diagnosing and classifying the types of inebriates who come to their attention, thus enabling them to dispose of each case in the appropriate manner." (p. 273)

MacCormick, "Correctional Views on Alcohol, Alcoholism and Crime," Alcohol, Alcoholism and Crime *Conference* 61 (Chatham, Mass.1962).

"My professional and personal interest in the alcoholic and in alcoholism began during the six years, 1934 to 1940, when I was Commissioner of Corrections in New York City * * *." (p. 61)

"I am not sure whether I was more impressed by the inhumanity of our methods of dealing with the alcoholic or by the futility of the process." (p. 61)

"In spite of the significant increase in the understanding of alcoholism which has taken place in the past 25 years, however, alcoholics for the most part are still dealt with in the legal and penal setting rather than by methods which are appropriate for persons presenting a socio-medical problem." (p. 63) " * * *, it would be a step in advance if laws and local ordinances throughout the country were changed

so that they could be committed under health or welfare laws rather than under penal statutes." (p. 64)

Murtagh, "The Derelicts of Skid Row," 209 Atlantic Monthly No. 3, 77 (1962). (Chief Magistrate to the City of New York, 1950–60.)

"Incarceration never cured a derelict, never did and never will. The problem of the skid-row derelict is basically social, medical, and spiritual in nature. Whether the derelict is a true alcoholic or merely a problem drinker, he usually has a much more deep-seated pathology, an emotional disturbance, if you will, that is an enigma to all of the disciplines. The penal approach to his problem is at best but a feeble attempt * * *." (p. 80)

National Institute of Mental Health, United States Department of Health, Education and Welfare, Alcoholism, Public Health Service Pub. No. 730 (rev. 1963).

"Only within the last two decades has alcoholism come to be accepted as a medical problem." (p. 9) "The term 'alcoholism' is not easy to define. It is generally used to cover a whole range of individual and social problems connected with the use of alcoholic beverages. People whose drinking causes them to become enmeshed in these problems are called 'alcoholics.'

"The World Health Organization describes alcoholism as ' * * * a chronic illness that manifests itself as a disorder of behavior. It is characterized by the repeated use of alcoholic beverages to an extent that exceed customary dietary use or compliance with social customs of the community and that interferes with the drinker's health or his economic or social functioning.'

"The National Council on Alcoholism defines an alcoholic as a 'person who is powerless to stop drinking and whose drinking seriously alters his normal living pattern.'

"It has been shown that alcohol can be physically addicting. The drinker may develop a tolerance to alcohol so that the same amount produces progressively less effect, and he craves larger and larger amounts. Eventually he must keep on drinking in order to avoid the severe and painful symptoms that result from abrupt withdrawal of alcohol. These symptoms include weakness, severe tremors, fever, and in some cases, convulsions and delerium tremens.

" * * * Alcoholism occurs when people continue to drink heavily in spite of the painful and injurious consequences they suffer." (pp. 2–3)

Goff, "Correction and the Alcoholic," The Court and the Chronic Inebriate: Conference Proceedings 21 (U.S. Department of Health, Education and Welfare 1965).

"The dilemma of handling cases of alcoholism involving chronic public intoxication, appears to be deeply routed [sic] in an underlying philosophy of justice which looks at chronic public intoxication as controllable by traditional correctional means. It is fed by the implied and sometimes expressed belief that the disease can be 'punished away.' Until there is greater recognition both intellectually and emotionally of alcoholism as a disease, the 'exercise in futility' of punitive measures to cope with the chronic police court offender will continue.

"What we propose would use repeated offenses of public intoxication as an indication, not of the need of the individual for increased penalties, but of the need of the individual for nonpunitive state handling. Legislative procedure should permit the commitment of selected alcoholics on a civil, not criminal basis, to specialized facilities and programs under the jurisdiction of medical and welfare authorities, for an intermediate period not exceeding one year." (p. 24)

Hall, "Drunkenness as a Criminal Offense," 1 Quarterly Journal of Studies on Alcohol 751 (1941).

" 'The trend of legislation is to treat habitual drunkenness as a disease of

mind and body, analogous to insanity, and to put in motion the power of the state, as the guardian of all its citizens, to save the habitual drunkard, his family, and society from the consequences of his habit. It is not a penal but a paternal statute. This statute is limited to persons who have lost the power or will to control their appetite for intoxicating liquors, and have a fixed habit of drunkenness, who are in need of care and treatment, and to those it would be dangerous to leave at large.' " [37]   (p. 758)

[37.] Leavitt v. City of Morris, 105 Minn. 170, 117 N.W. 393, 17 L.R.A., N.S., 984 (Minnesota, 1908).

" * * * excepting where serious personal injury is involved, there is no obstacle to elimination of punitive methods where others are reasonably indicated." (p. 763)

Alexander, Jail Administration 237–240 (1957).

"The alcoholic is the most common type of prisoner found in American jails. Usually he is committed for drunkenness, drunken driving, vagrancy, or as a public nuisance.

"But the jail is not the answer to the problem of the alcoholic, despite the fact that it has had to deal with drunks from time immemorial and will continue to deal with them for some foreseeable years ahead. The unending series of fines which must be lain out in jail and short jail sentences repeated endlessly month in and month out, year in and year out, bear not the slightest semblance of an intelligent approach to the treatment and solution of the alcoholic's problem." (p. 237)

Roche Laboratories, Aspects of Alcoholism (1963).

"[Alcoholism is] a condition which belongs in the realm of public health, but excludes the occasional excessive drinker whose disorderly conduct or automobile accident makes him more the concern of the civic authorities than of health personnel." (p. 9)

Pittman and Gordon, Revolving Door, A Study of the Chronic Police Case Inebriate (1958).

"The newer concept of alcoholism as a social, mental and physical illness is in gross conflict with punishment and confinement for the habitual public inebriate." (p. 141)

"The results of our investigation negate completely the assumption that incarceration acts as a deterrent to the chronic public inebriate." (p. 139)

Note, Legislation for the Treatment of Alcoholics, 2 Stan.L.Rev. 515 (1950).

"What is alcoholism? Authorities stress the fact that it is a health problem and not a penal one. It is a resultant of two factors: the individual's original psychological maladjustment, and the depressant effect of alcohol which creates of itself new maladjustments. The alcoholic feels he cannot successfully adjust to his environment without alcohol, but actually he cannot adjust successfully so long as he uses alcohol. The problem, then, is not solely alcohol but the *individual* and the manner in which he uses it. When an alcoholic shows pronounced mental and physical degeneration, he is termed 'chronic'." (footnotes omitted.) (pp. 515–16)

"At the local level, the so-called 'revolving door' treatment is prevalent. * * * The revolving door treatment is denounced as 'ineffective, expensive and undesirable.' It has not advocates or defenders." (footnotes omitted.) (p. 523)

"Judge Twain Michelson of San Francisco has called this 'cruel and unusual punishment'." (footnotes omitted.) (p. 523)

Hall, "Intoxication and Criminal Responsibility," 57 Harv.L.Rev. 1045 (1944).

"The disparity between judicial and available knowledge is indicated by the need to point out that one of the commonest of expert agreements is that 'alcoholic addiction' (dipsomania) is a disease." (p. 1073)

The Correctional Association of New York and The International Association of Chiefs of Police, Alcohol and Alcoholism, A Police Handbook.

"Alcoholism is a disease. The definition of a disease is: 'a disturbance in function or structure of any organ or part of the body, possessing certain recognizable symptoms.' Alcoholism fits this perfectly. The victim drinks repeatedly to drunkenness—despite the fact that it injures him physically or mentally, or endangers his earning capacity, or adversely affects his (or her) social and family life.

\*    \*    \*    \*    \*    \*

"The cause of the disease are [*sic*] not yet known, but it seems to be a combination of many physical and mental factors." (p. 14)

Celebrezze, Opening Remarks, HEW National Conference on Alcoholism (1963).

" \*    \*    \* alcoholism ranks as our fourth major health problem, following closely after cancer, heart disease, and mental illness." (p. iii)

McGOWAN, Circuit Judge:

I concur in the result reached by Judge Fahy, and in Parts I and III of his opinion. My reasons for doing so are stated hereinafter.

It was not argued to us on this appeal that we invalidate the D.C.Code provision against public intoxication on its face or as applied to any and all people found drunk in public places. What we were urged to do was to say that henceforth in this jurisdiction one charged with public drunkenness may assert chronic alcoholism as a defense and introduce evidence in support of that defense. This is what I consider we are doing in this case; and I agree that a remand is unnecessary only because the evidence of

chronic alcoholism as to this appellant is clear.

We may, in my view, summon this defense into being because we have both the authority and the duty to shape the criminal jurisprudence of the District of Columbia in accordance with civilized notions of justice. We are not like the ten other federal courts of appeals, whose authority over state criminal law derives only from the commands of the Constitution. In particular, we are not in the position of the Fourth Circuit when, in Driver v. Hinnant, 356 F.2d 761 (1966), it decided that the Eighth Amendment barred the conviction and imprisonment of a chronic alcoholic under a North Carolina statute directed at public drunkenness.

Our authority in this regard exists in any event, absent only an affirmative and valid legislative proscription of what we propose to do. Far from there being in effect such a veto by Congress in this instance, our duty to do as we do here is, if not compelled, at least strongly indicated and emphasized by the Act of August 4, 1947. In that statute Congress exhibited an extraordinarily sensitive awareness of the problems of acute alcoholism and enacted a singularly enlightened—and non-criminal—approach to be followed in this jurisdiction. Had Congress acted to implement this statute with the necessary appropriations and facilities, this appeal would presumably never have reached us. The substantive statute remains on the books. Only the implementation is missing.

The urgent need of that implementation is accentuated by what we do today. The community will not tolerate uncontrolled drunkenness in public places, and will insist that the police act to remove it as before. The power of the police in this respect is, in my view, unaffected by today's ruling.[1] But it does underscore

---

1. The Fourth Circuit has said in *Driver:*

We do not annul the North Carolina statute. It is well within the State's power and right to deter and punish public drunkenness, especially to secure others against its annoyances and intru-

sions. Robinson v. California, supra, 370 U.S. 600, 664 [82 S.Ct. 1417, 8 L. Ed.2d 758]. To this end any intoxicated person found in the street or other public areas may be taken into custody for inquiry or prosecution. But the

the necessity of coming to grips with the ultimate disposition of the chronic alcoholics among those so removed. Congress has already done so in the 1947 Act. All it needs to do now is to put some flesh on those bones.

DANAHER, Circuit Judge, with whom BURGER and TAMM, Circuit Judges, join, concurring in the result:

I join Judge McGowan in concluding that "a remand is unnecessary only because the evidence of chronic alcoholism as to this appellant is clear." I share his view that we have here been asked to say that henceforth "one charged with public drunkenness may assert chronic alcoholism as a defense and introduce evidence in support of that defense."

My real problem stems from the alternative clause in D.C.Code § 24–502 (1961). Its definition of a "chronic alcoholic" as one "who chronically and habitually uses alcoholic beverages to the extent that he has lost the power of self-control with respect to the use of such beverages," is clear enough. As here applied, so far, so good.

But the statute goes on to extend that category to include one who "while under the influence of alcohol *endangers* the *public* morals, health, *safety, or welfare.*" (Emphasis added.)

I am confident that Congress in its obvious purpose of seeking means for accomplishing the possible rehabilitation of the unfortunate victims of alcoholism had no thought whatever of addressing itself to some revised standards for determining criminal responsibility as to yet other crimes than public drunkenness. I wish to note my complete understanding that we are not now doing so. All too often this court has been confronted with circumstances of crime where intoxica-

tion has been urged as a ground of exculpation. See, e. g., Bishop v. United States, 71 App.D.C. 132, 135–136, 107 F.2d 297, 301–302 (1939); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959).

Obviously the application of any rule of law will depend upon the circumstances of a particular case. In the instant situation this appellant meets the definition of a chronic alcoholic because, by reason of his habitual use of alcoholic beverages, he "has lost the power of self-control with respect to the use of such beverages."

---

Constitution intercedes when on arraignment the accused's helplessness comes to light. Then it is that no *criminal* conviction may follow.

And the brief submitted to us for appellant characterized as "an unwarranted misrepresentation" the prosecution's claim that acceptance of his argument "would paralyze the efforts of the Metropolitan

Police to keep drunks off the public streets." The rationale of this characterization was said to be that the "defense [of chronic alcoholism] could neither be raised, nor resolved, until trial. That a defendant may be able to establish an absolute defense to the charge for which he is tried does not impair the validity of his arrest and prosecution * * *."