UNITED STATES of America
v.
Leroy **LINDSEY.**
Crim. No. 1881–70.

United States District Court, District of Columbia.
Jan. 25, 1971.

Axel Kleiboemer, Asst. U. S. Atty., Washington, D. C., for the United States.

Andrew T. Altmann, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GASCH, District Judge.

This case came on for trial on November 23, 1970. After a jury had been selected and the Government's evidence had been presented, the defendant elected to be tried by the Court and waived his right to trial by jury. The defendant is charged with violation of the narcotics laws of the United States, namely, 26 U.S.C. § 4704(a) and 21 U.S.C. § 174.

The evidence for the Government may be summarized as follows: Plainclothes officers Marshall and Lanigan were patrolling in the 900 block of Fourth Street, Northwest, in the vicinity of K Street at about 8:20 P.M. on the 14th of August, 1970. They saw the defendant with whose picture they were familiar and concerning whom they had prior information respecting narcotics matters and thereafter took him into custody and searched him. The search revealed 10 capsules subsequently found to contain heroin and 9 tinfoil wrapped packages, each containing an amount of heroin roughly equivalent to the amount normally found in four or five capsules. It was stipulated that the narcotic mixture in question contained 2,329 milligrams of heroin and other substances in the foil packets and 546 milligrams in the capsules, and that analysis would reveal that it was 5.3 percent heroin. It was also stipulated that there were no Federal revenue stamps on any of the narcotics. At the close of the Government's case, the defense made a motion for directed verdict and also renewed its earlier motion to dismiss the indictment in reliance upon the case of Watson v. United States, D.C.Cir., 1970, 439 F.2d 442. These motions were denied.

The defense then called the defendant who, among other things, admitted that he had just purchased the narcotics in question. His further testimony was to the effect that he had been an addict for 7 or 8 years during the course of which time he had received treatment at D. C. General Hospital and at a Veteran's Administration facility. Defendant's testimony was conflicting and evasive in regard to the amount of his daily habit, its cost, and how long the drugs seized in this case would last him. It seems that the defendant indicated that the present amount represented about a two-day supply, but even this answer was the subject of some conflict.

No medical evidence was introduced by either side to prove or disprove the defendant's claim of addiction, or to give information as to the characteristics of the addiction. The evidence other than defendant's testimony indicating possible addiction was the hearsay and opinion testimony of Officers Marshall and Lanigan (Transcript 22, 82) and the needle marks in defendant's arm. There was testimony that the needle marks were not fresh and also the contention that although the needle marks might indicate use, they do not necessarily indicate addiction.

The Government through cross-examination and rebuttal attempted to show that the defendant was not an addict or at least that he was not the type user of narcotics contemplated by *Watson*. Officer Lanigan testified that at the time of the arrest the defendant stated that he was not on "the stuff" (Transcript 79–80) and that no fresh needle marks on defendant's arm were noted. The defendant testified that he was not suffering from withdrawal symptoms and that he was on the Methadone maintenance program. (Transcript 72).

Since *Watson*, question has arisen as to how to deal with individuals who are charged only with possession of narcotics. Recently Judge Gesell in United States v. Ashton, D. C., 317 F.Supp. 860

(1970) dismissed the indictment charging violation of 26 U.S.C. § 4704(a) and 21 U.S.C. § 174, the same sections involved here, on the basis of *Watson.* The Court at that time pointed out the serious problems raised by *Watson.* One of those which concerns this Court is that if the defendant is found to be a "non-trafficking addict who possesses narcotics only for his own use" and the indictment is dismissed, the Court is thereby precluded from directing treatment under the Narcotic Addict Rehabilitation Act. Significantly in *Ashton,* though the narcotics indictments were dismissed, the defendant was eligible for treatment under NARA in that he was found guilty of a bail jumping charge. In the present case this situation does not obtain. Accordingly, if the indictment is dismissed, the Court will be unable to direct treatment. The Court finds it difficult to conclude that it was the intention of Congress or the Court of Appeals to require the discharge of an addict for the reason that he is a non-trafficking addict. Such a result would release a defendant-addict to prey on society[1] and/or impair his own health.

The Court agrees that jail is not the place for treatment of disease, nor is the criminal process designed for dealing with true sickness. Neither is the unsupervised return of such a person to the street. The *Watson* case makes frequent comparisons with insanity, but when a defendant is found incompetent to stand trial or not guilty by reason of insanity, he is not discharged to the detriment of himself or society. He is committed to a mental hospital for treatment. 24 D.C.Code § 301(d). Such treatment can under the circumstances of this case be made available for a narcotic addict.

The Court believes that an examination of *Watson* and the cases on which it is predicated is of assistance in the determination of the issue with which the Court is confronted. In Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1961), the Supreme Court held unconstitutional a California statute making mere addiction a crime in that it inflicted "cruel and unusual punishment" in violation of the Eighth and Fourteenth Amendments. The Court did say, however, that "A state might impose criminal sanctions, for example, against the unauthorized manufacture, prescription, sale, *purchase,* or *possession* of narcotics within its borders * * *" or it might wish to establish *"a program of compulsory treatment for those addicted to narcotics.* Such a program of treatment might require periods of involuntary confinement." 370 U.S. at 664–665, 82 S.Ct. at 1419 (emphasis added). The Court in *Robinson,* however, excluded punishment of an addict's *status* standing alone for the reason that this would be punishing a disease.

> It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. * * * a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. * * * In this Court counsel for the State recognized that narcotic addiction is an illness. (370 U.S. at 666, 82 S.Ct. at 1420).

In Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966), the Court of Appeals held that chronic alcoholism is a disease and as such is a defense to a charge of public intoxication. The Court defined a chronic alcoholic as follows: "The term 'chronic alcoholic' means any person who chronically and habitually uses alcoholic beverages to the extent that he has lost the power of self-control with respect to the

---

1. Some addicts have candidly told the Court that they support their narcotic habit by stealing, and the connection between narcotics traffic and other crimes in the District has frequently been established.

use of such beverages, or while under the influence of alcohol endangers the public morals, health, safety, or welfare." The Court emphasized that it was concerned particularly with the loss 'of the power of self-control.

An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. Thus an insane person is not guilty of the crime, * * * The law, in such a case based on morals, absolves him of criminal responsibility. So, too, in case of an infant. In case of a chronic alcoholic Congress has dealt with his condition so that in this jurisdiction he too cannot be held to be guilty of the crime of being intoxicated because, as the Act recognizes, he has lost the power of self-control in the use of intoxicating beverages. In his case an essential element of criminality, where personal conduct is involved, is lacking. This element is referred to in the law as the criminal mind. (361 F.2d at 52).

In short, the Court · takes the position that the chronic alcoholic lacks the requisite mens rea for the crime of public intoxication. The Court goes further:

We desire to make clear, however, that we are not absolving the voluntarily intoxicated person of criminal responsibility for crime in general under applicable law. (361 F.2d at 53).

The Court further notes that under § 24–504 of the District of Columbia Code, a person may be committed as a chronic alcoholic for treatment even though he may not be prosecuted.

In any criminal case, brought to trial before the District of Columbia Court of General Sessions, in which the evidence indicates that the defendant is a chronic alcoholic within the meaning of section 24–502, the judge may suspend the proceedings in the case and order that a hearing be held, upon sufficient notice, to determine whether the defendant is a chronic alcoholic. The hearing shall be conducted by the judge without a jury, unless the defendant requests a jury. The defendant shall be entitled to representation at the hearing by an attorney of his own choice, and if the defendant does not select an attorney, the court shall appoint an attorney to represent the defendant. *If after the hearing, the judge, or the jury, as the case may be, determine that the defendant is a chronic alcoholic, the court may order that he be committed to the clinic for diagnosis, classification, and treatment* as his condition may require, provided the term of commitment shall not exceed ninety days. (Emphasis added).

In *Easter* there was unrebutted expert medical and psychiatric evidence to show that the defendant was a chronic alcoholic who had lost self-control over his use of alcoholic beverages. *Easter* also held that it was cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to convict such a person.

Since the *Easter* decision, the Supreme Court decided Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). In *Powell*, the Court held that it could not conclude from the state of the record or present medical knowledge that "chronic alcoholics in general, and Leroy Powell in particular, suffer from such an irresistible compulsion to drink and to get drunk in public that they are *utterly unable* to control their performance of either or both of these acts and thus cannot be deterred at all from public intoxication." The Court seemed to say that to make out a constitutional defense, the defense would have to show both a "loss of control" once the individual has begun to drink and an "inability to abstain from drinking in the first place." In the *Powell* case, there was evidence that the compulsion to drink was not "completely overpowering." The *Powell* decision seemed to leave the question of mens rea open to the States for determination and formulation.

The *Watson* case was guarded in dealing with *Powell*, stating:

> This experience is not such as to encourage us, in the absence of further elucidation by the Supreme Court of the Eighth Amendment, to give it an expansive reading in respect of standards of criminal responsibility. 439 F.2d 451.

The Court, nevertheless, stated that *Easter* still retains vitality and that chronic alcoholism that manifests itself by public drunkenness is not criminally punishable in the District of Columbia. The Court concludes *Easter* "rested upon a ground alternative to that of the Eighth Amendment." This presumably referred to the doctrine of mens rea.

It would seem then that *Robinson* held that it was cruel and unusual punishment to penalize a person for the *status* of being an addict (lacking any actus rea). It is noted that *Robinson* did not define the word "addict." *Easter* in dealing with the chronic alcoholic contains appropriate definitions. Since *Powell*, it would seem that the first basis for *Easter*, cruel and unusual punishment, has been eroded unless a showing of "loss of control" and "inability to abstain" can be made. The lack of mens rea still seems to remain as a valid defense.

From this review of the cases, the Court gains some perspective in understanding *Watson*. *Watson* states:

> So it is that, if *Robinson's* [Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)] deployment of the Eighth Amendment as a barrier to California's making addiction a crime means anything, it must also mean in all logic that (1) Congress either did not intend to expose the non-trafficking addict possessor to criminal punishment, or (2) its effort to do so is as unavailing constitutionally as that of the California legislature. 439 F.2d 452.

The gist of the problem is that the Court does not define what it means by the word "addict." Many of the definitions of "addict" are not especially helpful for our purposes.[2] (*Cf.* the Court's dissatisfaction with an adequate definition of "chronic alcoholic" and "disease" in the *Powell* opinion.) If an addict within the meaning of *Watson* is regarded as one who lacks the ability to abstain from taking or using narcotics or is utterly unable to control his actions in regard to the taking of narcotic drugs, some of the practical difficulties in this case will be obviated. The Court concludes that one who is in this status, i. e., unable to resist the compulsive urge to take narcotic drugs, would lack the

---

2. In a medically restricted sense, drug addiction is synonymous with physical dependence, i. e., a state produced by repeated administration of certain drugs with the result that abrupt withdrawal of them is followed by physiological and psychological disturbances that are usually transient but may terminate fatally. Associated with the development of physical dependence is the acquisition of tolerance —i. e., a progressive decline in the degree of effect produced by a given dose of the drugs; as the effect declines, the user is impelled to increase dosage progressively, with the attendant hazards of toxic side effects and further intensification of his need for the drug to prevent abstinence distress. This cycle greatly enhances the habituation process. (Encyclopedia Brittanica, Vol. 7, 1968, p. 703).

* * *—a state characterized by an overwhelming desire or need (compulsion) to continue use of a drug * * * obtain it by any means, with a tendency to increase dosages, a psychological and usually physical dependence are the effect. (Dorland's Medical Dictionary, 24th Edition, 1965).

Addict—One who is addicted to a habit; one who habitually uses and has an uncontrollable craving for an addicting drug.

Addiction—The compulsive uncontrolled use of habit-forming drugs beyond the period of medical need or under conditions harmful to society. (Webster's Third New International Dictionary, p. 24 (1966)).

requisite mens rea to be responsible criminally for simple non-trafficking possession of a narcotic drug for his own use.

■■ After an examination of the evidence in the present case, the Court finds the defendant, Leroy Lindsey, guilty as charged.[3]

The Court takes particular cognizance of elements in the defendant's testimony and the lack of convincing evidence as to addiction and compulsion. The defendant on cross-examination indicated that on the 14th of August when he was arrested he had simply made up his mind to get high so that he could watch the Redskins football game. (Transcript 73). The Court concludes that this does not indicate the requisite inability to abstain from taking or using narcotics or that Lindsey was utterly unable to control his actions in regard to the taking of narcotic drugs. Lindsey also indicated that he had been on the Methadone maintenance program and that he was not experiencing any withdrawal symptoms. (Transcript 74). The Court in *Powell* in discussing alcoholism cites E. M. Jellinek:

> Moreover, Jellinek asserts that it cannot accurately be said that a person is truly unable to abstain from drinking unless he is suffering the physical symptoms of withdrawal. (392 U.S. at 525, 88 S.Ct. at 2151).

The evidence before the Court furnishes no basis for concluding that this type of test is met. Although it may be arguable that Lindsey had a strong urge or desire to take narcotics, the Court concludes that the defense has fallen short of showing either involuntariness or pharmacological duress, or an utter lack of control in regard to the use of narcotic drugs, or an inability to abstain from the use of narcotics which would negate the requisite mens rea for the crime with which he is charged or which would make it cruel and unusual punishment to convict him. In this case, unlike *Robinson*, a *status* lacking an *actus rea* is not the subject of punishment. Nor is this case like *Easter* where a person lacking the requisite mens rea was the subject of punishment. This case is comparable to *Powell* in that it has not been demonstrated that defendant was utterly unable to control his actions. It is unlike *Ashton* in that the evidence of addiction is effectively challenged by the Government. Here, there is no evidence of compulsive taking of narcotics.[4]

3. Under definition of an addict in the Narcotic Addict Rehabilitation Act, 18 U.S.C. § 4251(a), which is in the alternative:
18 U.S.C. § 4251(a) (Narcotic Addict Rehabilitation Act): "Addict" means any individual who habitually uses any narcotic drug as defined by section 4731 of the Internal Revenue Code of 1954, as amended, so as to endanger the public morals, health, safety, or welfare or who is or has been so far addicted to the use of such narcotic drugs as to have lost power of self-control with reference to his addiction.
The Court retains the power to commit for treatment a habitual user regardless of whether he has lost the power of self-control.
It may seem somewhat anomalous that the more seriously affected type of narcotic user, that is to say, one who has lost the power of self-control, would not be subject to the same type of remedial attention as the Court has determined would be proper for the defendant in this case. This result is reached only because the Court has sought to follow the dictum in *Watson*.

4. On February 4, 1971, when the defendant in open Court was formally advised of the finding of this Court and when he was told by the Court that the Court intended to give him the benefit of the Narcotic Addict Rehabilitation Act, his counsel stated after conferring with the defendant:
> "Does counsel have any objections or does the defendant have any objections to that commitment [under the NARA] being forthwith?"
> "MR. ALTMAN: Your Honor, the defendant states he doesn't have a habit any more and states he thinks he ought to be put on probation."