Charles C. ROUSE, Appellant,

v.

Dale C. CAMERON, Superintendent, Saint
Elizabeths Hospital, Appellee.

No. 19863.

United States Court of Appeals
District of Columbia Circuit.

Argued March 23, 1966.

Decided Oct. 10, 1966.

As Amended April 4, 1967.

452

Mr. Edward E. O'Neill, Washington, D. C., for appellant.

Mr. John A. Terry, Asst. U. S. Atty., with whom Messrs. David G. Bress, U.

S. Atty., and Frank Q. Nebeker and Earl J. Silbert, Asst. U. S. Attys., were on the brief, for appellee. Mr. Oscar Altshuler, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, and FAHY and DANAHER, Circuit Judges.

BAZELON, Chief Judge.

In this habeas corpus case appellant attacks his confinement in Saint Elizabeths Hospital. He was involuntarily committed [1] in November 1962 by the Municipal Court, now the Court of General Sessions, upon finding him not guilty by reason of insanity of carrying a dangerous weapon, a misdemeanor for which the maximum imprisonment is one year.[2] The District Court has held a hearing and denied relief in habeas corpus. It refused to consider appellant's contention that he has received no psychiatric treatment. The judge said:

> My jurisdiction is limited to determining whether he has recovered his sanity. I don't think I have a right to consider whether he is getting enough treatment. * * *

I

The principal issues raised by this appeal are whether a person involuntarily committed to a mental hospital on being acquitted of an offense by reason of insanity has a right to treatment that is cognizable in habeas corpus, and if so, how violation of this right may be established.

The purpose of involuntary hospitalization is treatment, not punishment.[3] The provision for commitment

1. D.C.Code § 24–301(d) (1961).

2. D.C.Code § 22–3215 (1961).

3. S.REP.No. 1170, 84th Cong., 1st Sess. (1955); H.R.REP. No. 892, 84th Cong., 1st Sess. (1955). See Overholser v. Lynch, 109 U.S.App.D.C. 404, 410, 288 F.2d 388, 394 (1961) (en banc), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962):

[O]nce it is determined that a defendant is to be hospitalized for treatment of a mental disease or defect, further consideration of the criminal penalty provided by statute becomes irrelevant, for any and all purposes. The length of his hospitalization must depend solely on his need (or lack of it) for further treatment. It is true that he may be hospitalized for a longer time than the maximum jail sentence provided by statute. It is equally true that he may be released in a shorter time than the minimum sentence. Hospitalization, in this respect, bears no relation to a jail sentence. A jail sentence is punitive

rests upon the supposed "necessity for treatment of the mental condition which led to the acquittal by reason of insanity." [4] Absent treatment, the hospital is "transform[ed] * * * into a penitentiary where one could be held indefinitely for no convicted offense, and this even though the offense of which he was previously acquitted because of doubt, as to his sanity might not have been one of the more serious felonies" [5] or might have been, as it was here, a misdemeanor.

Absence of treatment "might draw into question 'the constitutionality of [this] mandatory commitment section' as applied." [6] (1) Lack of improvement raises a question of procedural due process where the commitment is under D.C. Code § 24–301 rather than under the civil commitment statute,[7] for under § 24–301 commitment is summary, in contrast with civil commitment safeguards.[8] It does not rest on any finding of present insanity and dangerousness but, on the contrary, on a jury's reasonable doubt that the defendant was sane when he committed the act charged. Commitment on this basis is permissible because of its humane therapeutic goals.[9] (2) Had appellant been found criminally responsible, he could have been confined a year, at most, however dangerous he might have been. He has been confined four years and the end is not in sight. Since this difference rests only on need for treatment,[10] a failure to supply treatment may raise a question of due process of law. It has also been suggested that a failure to supply treatment may violate the equal protection clause.[11] (3) Indefinite confinement without treatment of one who has been found not criminally responsible may be so inhumane as to be "cruel and unusual punishment." [12]

Impressed by the considerable constitutional problems that arise because "institutionalized patients often receive only custodial care," [13] Congress established a *statutory* "right to treatment" in the 1964 Hospitalization of the Mentally Ill Act. The Act provides:

A person hospitalized in a public hospital for a mental illness shall, during his hospitalization, be entitled to medical and psychiatric care and treatment. The administrator of each pub-

and is to be imposed by the judge within the limits set by the legislature. Hospitalization is remedial and its limits are determined by the condition to be treated.

See also Ragsdale v. Overholser, 108 U.S. App.D.C. 308, 281 F.2d 943 (1960); Hough v. United States, 106 U.S.App. D.C. 192, 196, 271 F.2d 458, 462 (1959); Williams v. United States, 102 U.S.App. D.C. 51, 57–58, 250 F.2d 19, 25–26 (1957).

4. Ragsdale v. Overholser, 108 U.S.App. D.C. 308, 315, 281 F.2d 943, 950 (1960) (Fahy, J., concurring).

5. *Ibid.*

6. Darnell v. Cameron, 121 U.S.App.D.C. 58, 62, 348 F.2d 64, 68 (1965). See Birnbaum, *The Right to Treatment*, 46 A.B.A.J. 499 (1960).

7. Ragsdale v. Overholser, *supra* note 4, 108 U.S.App.D.C. at 316, 281 F.2d at 951 (Fahy, J., concurring).

8. Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Ragsdale v. Overholser, *supra* note 4, 108 U.S.

App.D.C. at 316, 281 F.2d at 951 (Fahy, J., concurring).

9. Ragsdale v. Overholser, *supra* note 4. Such summary commitment, of course, also serves to protect society from danger. Ragsdale v. Overholser, *supra* at 312, 281 F.2d at 947. But if this were the only purpose, then a full range of procedural safeguards might be constitutionally required. *Cf.* Benton v. Reid, 98 U.S.App.D.C. 27, 231 F.2d 780 (1956); Kautter v. Reid, 183 F.Supp. 352, 353– 354 (D.D.C.1960) (Youngdahl, J.).

10. See note 3 *supra.*

11. See Sas v. State of Maryland, 334 F.2d — 506, 509 (4th Cir. 1964).

12. *Cf.* Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966).

13. *Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on a Bill to Protect the Constitutional Rights of the Mentally Ill,* 88th Cong., 1st Sess. 12 (1963) [hereinafter *1963 Hearings*].

454

lic hospital shall keep records detailing all medical and psychiatric care and treatment received by a person hospitalized for a mental illness and the records shall be made available, upon that person's written authorization, to his attorney or personal physician.[14] It appears that this provision, like the one limiting the use of mechanical restraints,[15] was intended to cover persons hospitalized under any statutory authorization. Other sections of the Act apply only to patients "hospitalized pursuant to [the 1964 Act],"[16] or to "mentally ill persons,"[17] which term is defined by the Act to exclude persons committed by court order in a criminal proceeding.[18] Since there are no such limitations in the "right to treatment" provision set forth above, that right necessarily extends to involuntary commitment under D.C.Code § 24-301.[18a]

14. D.C.Code § 21-562 (Supp. V, 1966). .

15. D.C.Code § 21-563 (Supp. V, 1966).

16. See, e. g., D.C.Code §§ 21-561, 21-564 (Supp. V, 1966).

17. See D.C.Code § 21-543 (Supp. V, 1966).

18. D.C.Code § 21-501 (Supp. V, 1966).

18a. The plain language of the statute that "[a] person hospitalized in a public hospital for a mental illness shall * * * be entitled to medical and psychiatric care and treatment" should be followed even if the legislative history may be construed to the contrary. Moreover, the legislative history in this case is ambigous.

The House Committee Report did make the broad statement that the bill applied only to those committed in civil proceedings. H.R.Rep. No. 1833, 88th Cong., 2d Sess. 3 (1964). The Report did not recommend enactment of this broad statement. It did recommend an amendment which defined a "mentally ill person" to exclude persons "committed * * * in a criminal proceeding." H.R.Rep. No. 1833, at p. 1. Since this definition was used in only a few sections of the Act, the Committee could not have based the broad statement in the Report on the amended definition. If the Committee had believed that its broad statement was true even without the amendment, the Committee would not have suggested the amendment.

The Committee Report made one other similarly broad statement about most of the Act when it suggested that the words "in a noncriminal proceeding" be added to the section, now D.C.Code § 21-589(a) (Supp. V, 1966), which made several sections (including the right to treatment provision) retroactive. H.R.Rep. No. 1833, at 19. The statement is not supported by the retroactivity section which, by its terms, applies only to people committed before September 15, 1964. And again, if the Committee believed the entire Act applied only to those committed in civil proceedings, even without the amendment to the retroactivity section, then the Committee could not have thought the amendment necessary.

Likewise, Senator Ervin's statement on the floor, that the House version of the bill applied only to "civil hospitalization procedures," 110 Cong.Rec. 21345 (1964), is not supported by either amendment. Once again, if he thought that the entire Act was so limited even without the House amendments, then both amendments would have been unnecessary. Further, the right to treatment of a patient already in a mental institution is not related to "hospitalization procedures," either civil or criminal.

We must assume that the language of the treatment provision, and not the statements, represents the will of Congress, especially since the provision—unlike the statements—does not raise the serious equal protection question of discrimination between those committed in "criminal proceedings" and those civilly committed. Baxstrom v. Herold, 383 U.S. 107, 86 S. Ct. 760, 15 L.Ed.2d 620 (1966) (prior criminal conduct not a proper basis for denial without a hearing of confinement rights that may only be taken from others after a hearing).

The ambiguity of the legislative history and of much of the statute is further illustrated by D.C.Code § 21-589(a) which provides that certain sections of the Act, including the right to treatment provision, "apply to a person, who. on or after January 1, 1966, is a patient in a hospital in the District of Columbia by reason of having been declared insane or of unsound mind pursuant to a court order entered in a noncriminal proceeding prior to September 15, 1964."

If this section describes the only people who will enjoy its rights then those rights would not apply to anyone who was committed after the enactment of the statute. This interpretation would be unthinkable. Nor can this section describe the only people committed before September 15, 1964, who will enjoy those rights. This reading would create two arbitrary distinctions, at least with regard to the right

Moreover, the considerations underlying the right to treatment provision in the 1964 Act apply with equal force to commitment under D.C.Code § 24–301. These considerations are reflected in the statement of Senator Ervin, sponsor of the bill in the Senate. He called mere custodial care of hospitalized persons "shocking" and stated that of all the areas in which reform is badly needed, the "right to treatment" was "perhaps the most critical." He further said:

> Several experts advanced the opinion that to deprive a person of liberty on the basis that he is in need of treatment, without supplying the needed treatment, is tantamount to a denial of due process. [The Senate bill] * * * embodies provisions which will ameliorate this problem whereas existing law makes no provisions for safeguarding this right.[19]

Regardless of the statutory authority, involuntary confinement without treatment is "shocking." Indeed, there may be greater need for the protection of the right to treatment for persons committed without the safeguards of civil commitment procedures. Because we hold that the right to treatment provision applies to appellant, we need not resolve the serious constitutional questions that Congress avoided by prescribing this right.

The Group for the Advancement of Psychiatry has urged that "provisions that safeguard the patient's right to good treatment as opposed to simple custody" are an essential element of commitment laws.[20] A right to treatment in some form is recognized by law in many states.[21] The requirement in the 1964 Act that the hospital keep records detailing psychiatric care and treatment and make them available to the patient's attorney reinforces our view that Congress intended to implement the

to treatment. First, the right to treatment would be available to those criminally committed after September 15, 1964, but not to those criminally committed before that date. Second, and more important, the right to treatment would apply to those civilly committed before September 15, 1964, but not to those criminally committed at the same time. As a general matter this distinction is unwarranted (see text following note 18a *infra*) and may raise constitutional doubts (Baxstrom v. Herold, *supra*.) But it is especially irrational in the context of a statute which we have construed to provide a right to treatment without distinction between those civilly and those criminally committed after September 15, 1964.

We think D.C.Code § 21–589(a) must be read as permissive, describing one group of people who will enjoy certain rights without necessarily excluding anyone else. Again, this interpretation avoids imputing to Congress an intent to discriminate irrationally among patients in mental institutions. Baxstrom v. Herold, *supra*.

Our construction is not affected by any other matter of legislative history. See, *e. g.*, H.R.Rep. No. 1833, at p. 7; S.Rep. No. 925, 88th Cong., 2d Sess. 30, 40 (1964); 110 Cong.Rec. 14552, 20791, 20792, 21346 (1964).

19. *1963 Hearings* at 12. See, *e. g.*, Statement of Richard Arens, Attorney, *1963*

*Hearings* at 49; Statement of Dr. Dale Cameron, Superintendent, Saint Elizabeths Hospital, *1963 Hearings* at 146; Statement of Dr. Morton Birnbaum, *Hearings Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary On Constitutional Rights of the Mentally Ill*, 87th Cong., 1st Sess. 273–305 (1961) [hereinafter *1961 Hearings*]; Statement of Dr. Winfred Overholser, *1961 Hearings* at 25; Statement of Dr. Addison Duval, *1961 Hearings* at 14; Statement of Abe Krash, Attorney, *1961 Hearings* at 620.

20. GROUP FOR THE ADVANCEMENT OF PSYCHIATRY, LAWS GOVERNING HOSPITALIZATION OF THE MENTALLY ILL 157 (Report No. 61, 1966).

21. See NEW YORK MENTAL HYGIENE LAW, MCKINNEY's CONSOL. LAWS, c. 27, § 86; IDAHO CODE ANN. § 66–344; IOWA CODE § 225.15; MO.STAT.ANN. § 202.840; NEW MEXICO STAT. § 34–2–13; OKLA.STAT. tit. 43A, §§ 2, 91; VERNON's ANN.TEX. CIV.STAT.ANN. Art. 5547–70; CAL.WELF. AND INST.CODE ANN. § 6621; UTAH CODE ANN. § 64–7–46; ILL.REV.STAT. ch. 91½, §§ 12–2, 12–16, 100–7 (1965 Supp.). See generally Ross. *Commitment of the Mentally Ill: Problems of Law and Policy*, 57 MICH.L.REV. 945, 1002, n. 156 (1959).

right to treatment by affording a judicial remedy for its violation.[22]

The patient's right to treatment is clear.[23] We now consider how violation of the right may be established.

## II

■ According to leading experts "psychiatric care and treatment" includes not only the contacts with psychiatrists but also activities and contacts with the hospital staff designed to cure or improve the patient.[24] The hospital need not show that the treatment will cure or improve him but only that there is a bona fide effort to do so. This requires the hospital to show that initial and periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for him,[25] and that the program provided is suited to his particular needs. Treatment that has therapeutic value for some may not have such value for others. For example, it may not be assumed that confinement in a hospital is beneficial "environmental therapy"[26] for all.[27]

■ The effort should be to provide treatment which is adequate in light of present knowledge. Some measures

22. This requirement also suggests the appropriateness of administrative procedures for considering complaints alleging lack of treatment. These procedures would not only provide the Hospital an opportunity to afford a remedy, but would also provide a record which might assist in the disposition of any resulting litigation. And given "adequate and available" administrative procedures, it might be argued, although we do not decide, that the doctrines of primary jurisdiction and exhaustion of remedies would apply. See, e.g., Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915, decided June 16, 1966.

23. Senator Robert Kennedy has recently introduced a bill in Congress to establish procedures and standards for commitment of defendants found not guilty by reason of insanity in all federal jurisdictions except the District of Columbia, which is already covered by the mandatory commitment statute, D.C.Code § 24–301 (1961), and the 1964 Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501 to 21–591 (Supp. V, 1966). This bill explicitly states that any person confined under its provisions "shall receive medical and psychiatric care and treatment." S. 3689, 89th Cong., 2d Sess. § 4249(b) (1966). In introducing this bill on the floor of the Senate, Senator Kennedy noted that this statutory right to treatment

is based upon the language in section 21–562 of the District of Columbia Code, which is the part of the District of Columbia Hospitalization of the Mentally Ill Act that expressly creates a right to care and treatment. This bill therefore contemplates that the adequacy of the treatment which a confined person is receiving will be relevant in later inquiries as to whether his commitment for treatment should be continued.

112 CONG.REC. 17522 (daily ed. Aug. 4, 1966).

24. See OVERHOLSER & RICHMOND, HANDBOOK OF PSYCHIATRY 35 (1947).

25. The need for periodic examination of the patient is explicitly recognized in the 1964 Hospitalization of the Mentally Ill Act, which provides that "the chief of service of a public or private hospital shall, as often as practicable, but not less often than every six months, examine or cause to be examined each patient admitted to a hospital pursuant to this subchapter * * *" D.C.Code § 21–548 (Supp. V, 1966). Cf. HANDBOOK OF PUBLIC ASSISTANCE ADMINISTRATION, MEDICAL ASSISTANCE PROGRAMS, Supp. D, D–5230 item D (May 13, 1966):

Responsibilities for Recipient Patient in Mental Hospitals.

* * * * * * *

3. Periodic joint planning and assessment by designated agency and institutional staff regarding the care, treatment, and progress of each recipient-patient. at intervals not to exceed three months, to assure that all appropriate measures are taken for his improvement and that continued treatment in the institution is necessary.

26. See JONES, THE THERAPEUTIC COMMUNITY (1953): STANTON & SCHWARTZ, THE MENTAL HOSPITAL (1954).

27. "[T]he milieu of the hospital, if properly structured, is * * * a constructive force for getting well; if improperly constructed it is a force for remaining sick." Statement of Dr. Dale Cameron, Superintendent, Saint Elizabeths Hospital, 1963 Hearings, at 146.

which have therapeutic value for the particular patient may be too insubstantial in comparison with what is available. On the other hand, the possibility of better treatment does not necessarily prove that the one provided is unsuitable or inadequate.[28]

It has been said that "the only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment." [29] But lack of finality cannot relieve the court of its duty to render an informed decision. Counsel for the patient and the government can be helpful in presenting pertinent data concerning standards for mental care,[30] and, particularly when the patient is indigent and cannot present experts of his own,[31] the court may appoint independent experts.[32] Assistance might be obtained from such sources as the American Psychiatric Association, which has published standards [33] and is continually engaged in studying the problems of mental care.[34] The court could also consider inviting the psychiatric and legal communities to establish procedures by which expert assistance can be best provided.[35]

Continuing failure to provide suitable and adequate treatment cannot be justified by lack of staff or facilities. Congress considered a Draft Act Governing Hospitalization of the Mentally Ill prepared by the National Institute of Mental Health and the General Counsel of the Federal Security Agency, which contained the following provision:

> Every patient shall be entitled to humane care and treatment and, *to the extent that facilities, equipment, and personnel are available,* to medical care and treatment in accordance with the highest standards accepted in medical practice. [Emphasis supplied.]

The italicized language was omitted in the present Act. This omission plainly evidences the intent to establish a broad-

---

28. We need not now resolve the implications of the "right to treatment" for a patient who is demonstrated by the hospital to be "untreatable" in the present state of psychiatric knowledge, if such a patient exists. See Statement of Dr. Winfred Overholser, then Superintendent of Saint Elizabeths Hospital, *1961 Hearings* at 594:

    I do not believe we should write off any patient as incurable. * * * In other words, we are going to try our hand at treating every patient that is sent to us.

29. Greenwood v. United States, 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956) (Frankfurter, J.).

30. *Cf.* Rollerson v. United States, 119 U.S. App.D.C. 400, 343 F.2d 269 (1965). Courts are familiar with problems of determining medical standards in medical malpractice suits. See, *e.g.*, Price v. Neyland, 115 U.S.App.D.C. 355, 358, 320 F.2d 674, 677, 99 A.L.R.2d 1391 (1963). While the issue of adequacy of treatment is not the same as the issue of negligence, the evidentiary problems are similar.

31. See Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657, decided May 19, 1966. *Cf.* DeMarcos v. Overholser, 78 U.S.App.

D.C. 131, 132, 137 F.2d 698, 699, cert. denied, 320 U.S. 785, 64 S.Ct. 157, 88 L. Ed. 472 (1943); Curry v. Overholser, 109 U.S.App.D.C. 283, 286, 287 F.2d 137, 140 (1960) (right of indigent to independent examination).

32. "Appellate courts no longer question the inherent power of a trial court to appoint an expert under proper circumstances to aid it in the just disposition of a case." Scott v. Spanjer, 298 F.2d 928, 930, 95 A.L.R.2d 383 (2d Cir. 1962). See WIGMORE, EVIDENCE § 2484 at 270 (3rd ed. 1940); Lake v. Cameron, *supra* note 31. *Cf.* Rule 28, FED.R.CRIM.P.

33. AMERICAN PSYCHIATRIC ASSOCIATION, STANDARDS FOR HOSPITALS AND CLINICS (Rev. 1958); AMERICAN PSYCHIATRIC ASSOCIATION, EMERGING PATTERNS OF ADMINISTRATION IN PSYCHIATRIC FACILITIES (1964).

34. Other such sources might include the National Institute of Mental Health, the National Association of State Mental Health Program Directors, the Group for the Advancement of Psychiatry, and experts from various universities.

35. Such procedures might include provision of permanent or rotating panels of experts.

er right to treatment.[36] As the Fourth Circuit Court of Appeals said of the right to treatment under Maryland's "defective delinquent" statute, "[d]eficiencies in staff, facilities, and finances would undermine * * * the justification for the law, and ultimately the constitutionality of its application." Sas v. State of Maryland, 334 F.2d 506, 517 (4th Cir. 1964).

We are aware that shortage of psychiatric personnel is a most serious problem today in the care of the mentally ill.[37] In the opinion of the American Psychiatric Association no tax-supported hospital in the United States can be considered adequately staffed.[38] We also recognize that shortage cannot be remedied immediately.[39] But indefinite delay cannot be approved. "The rights here asserted are * * * *present* rights * * * and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled." Watson v. City of Memphis, 373 U.S. 526, 533, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963).[40]

■■ One who is "in custody in violation of the Constitution and laws" of the United States is entitled to relief in habeas corpus, and the court is required to "dispose of the matter as law and justice require." [41] If the court finds that a mandatorily committed patient, such as appellant, is in custody in violation of the Constitution and laws, it may allow the hospital a reasonable opportunity to initiate treatment. In determining the extent to which the hospital will be given an opportunity to develop an adequate program, important considerations may be the length of time the patient has lacked adequate treatment, the length of time he has been in custody, the nature of the mental condition that caused his acquittal, and the degree of danger, resulting from the condition, that the patient would present if released. Unconditional or conditional release may be

36. At the 1963 Hearings before the Subcommittee on Constitutional Rights, the following colloquy occurred between William A. Creech, Chief Counsel and Staff Director to the Committee, and Dr. Dale Cameron, Superintendent of Saint Elizabeths Hospital:

"MR. CREECH: In your memorandum you say that your hospital has a severely limited staff. I wonder, sir, if you feel, inasmuch as you mentioned providing a staff for the Mental Health Commission, that you also must have an adequate staff to provide treatment for the mentally ill individuals who are hospitalized?

"DR. CAMERON: Well, we certainly, I certainly, believe that our staff is not what it should be, and we do need additional help in this regard.

"I am not at all sure that a commitment law or an admission procedure is necessarily the place to try to provide the additional staff needed for the hospital, but I think it is a quite appropriate place to state what the goal of treatment in these hospitals should be, and recognize that it takes staff as well as reporting systems to assure adequacy of treatment."

37. U.S. SURGEON GENERAL'S AD HOC COMMITTEE ON PLANNING FOR MENTAL HEALTH FACILITIES, PLANNING OF FA- CILITIES FOR MENTAL HEALTH SERVICES 38 (1961). See ALBEE, MENTAL HEALTH MANPOWER TRENDS (1959).

38. U.S. SURGEON GENERAL'S AD HOC COMMITTEE, *supra* note 37, at 39. In 1958, Dr. Harry C. Solomon, then President of the American Psychiatric Association, stated, "After 114 years of effort, in this year 1958, rarely has a state hospital an adequate staff measured by the minimum standards set by our Association, and these standards represent a compromise between what was thought to be adequate and what it was thought had some possibility of being realized." Solomon, *The American Psychiatric Association in Relation to American Psychiatry*, 115 AM.J. PSYCHIATRY 1, 7 (1958).

39. Those authorities who recognize the problem also advance means for its amelioration. See U. S. SURGEON GENERAL'S AD HOC COMMITTEE, *supra* note 37, at 39; ALBEE, *supra* note 37, at 241–59.

40. See also Bradley v. School Board, 382 U.S. 103, 105, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Goss v. Board of Education, 373 U.S. 683, 689, 83 S.Ct. 1405, 10 L.Ed. 2d 632 (1963); Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S. Ct. 464, 100 L.Ed. 486 (1956).

41. 28 U.S.C. §§ 2241(c) (3), 2243 (1964).

in order if it appears that the opportunity for treatment has been exhausted or treatment is otherwise inappropriate. It is unnecessary to detail the possible range of circumstances in which release would be the appropriate remedy.

The government says the record shows that appellant is receiving adequate treatment. Since the District judge found no right to treatment, he did not inquire into the question of adequacy. There was evidence that appellant voluntarily left group therapy several months before the hearing below. But there was no inquiry into such questions as the suitability of group therapy for his particular illness, whether his rejection of this therapy was a manifestation and symptom of his mental illness, and whether reasonable efforts were made either to deal with such rejection or to provide some other suitable treatment. Also, the government psychiatrist said that appellant was receiving "environmental therapy." But the suitability and adequacy of the "milieu" as therapy for this petitioner was not explored.

■ We think "law and justice require" that we remand for a hearing and findings on whether appellant is receiving adequate treatment, and, if not, the details and circumstances underlying the reason why he is not. The latter information is essential to determine whether there is "an overwhelmingly compelling reason" for the failure to provide adequate treatment.

## III

■ The appellant challenges also the District Court's finding that he has not recovered his mental health. A person involuntarily committed and confined under D.C.Code § 24–301 is entitled to release if he has "recovered his sanity and will not in the reasonable future be dangerous to himself or others." That the "person so confined has some dangerous propensities does not, standing alone, warrant his continued confinement in a government mental institution under § 24–301 D.C.Code. The dangerous propensities * * * must be related to or arise out of an abnormal mental condition." [42] The District Court's findings concerning mental illness and dangerous propensities are not to be disturbed unless they lack support in the record or rest on an erroneous legal principle.

Three psychiatrists gave conflicting testimony. Dr. Economon of Saint Elizabeths testified that appellant was suffering from "anti-social reaction" and described its symptoms. Dr. Marland, in private practice, and Dr. Bunge, of the Commission on Mental Health, testified that appellant was not suffering from mental illness. But we do not reach the question whether the record would have supported a finding of present mental illness and dangerous propensities. For the record shows that in assessing danger the District judge may have relied primarily on the nature of the offense with which the appellant had been charged in 1962 rather than his present condition. For example, the judge said to government counsel, after questioning him and Dr. Marland about the offense:

> I venture to suggest, Mr. Silbert, that in these cases that arise out of a criminal proceeding it would be useful to know the facts of the crime in every case, even if you have to dig them up from the files of the Municipal Court, because I have to protect the public. That is the principal thing that I have

42. Overholser v. O'Beirne, 112 U.S.App. D.C. 267, 269–270, 302 F.2d 852, 854–855 (1961). See Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388 (1961) (en banc), rev'd on other grounds, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Ragsdale v. Overholser, 108 U.S. App.D.C. 308, 281 F.2d 943 (1960); Hough v. United States, 106 U.S.App.D.C. 192, 271 F.2d 458 (1959); Starr v. United States, 105 U.S.App.D.C. 91, 96–97, 264 F.2d 377, 382–383 (1958) (en banc), cert. denied, 359 U.S. 936, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959). See generally Goldstein & Katz, *Dangerousness and Mental Illness: Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity*, 70 Yale L.J. 225 (1960).

to consider. I would consider myself derelict in my duty if I released him and then a few weeks later he shot somebody with a .45 Colt automatic. That is why I want to know how he came to be arrested for carrying a gun. He must have done something to call the attention of the police to the fact that he had a gun. The police don't just stop anybody on the street and say, have you got a gun.

\* \* \* \* \* \*

You could talk to the arresting Officer if he is still on the Force. He would probably remember how he came to arrest this man. I think those facts are important.

There is a big difference between releasing a man, say, who overdrew his bank account and one who had a gun. If you release a man who overdrew his bank account, the worst that can happen, he might do it again; but when you release a man who has been carrying a .45 automatic, that is a pretty serious matter.

The judge concluded: "In view of the fact that the original arrest involved a dangerous weapon, an extremely dangerous weapon, with a great deal of ammunition, the Court is not going to undertake to release him unconditionally and would have great hesitancy in releasing him even conditionally." The judge then continued the hearing pending a report from the Commission on Mental Health.

The Commission reported that appellant had "recovered" and that "further confinement would stifle his future development." The hearing resumed with the following colloquy:

Court: The court has before it the report of the Commission on Mental Health. Is this the case in which the petitioner was arrested in possession of a .45 caliber revolver?

Mr. Silbert: With 600 rounds of ammunition, too. This was at 1:45 in the morning at 14th & Harvard Sts. N.W.

The judge then pursued at length with Dr. Bunge, as he had with Dr. Marland, appellant's purpose in possessing a gun and ammunition. At the conclusion of the doctor's testimony the judge said:

I do want to ask you one question, Doctor. I am going to ask you that question in view of the fact that [petitioner] \* \* \* was caught in the possession of a .45 pistol and 600 rounds of ammunition. My principal interest must be to protect the public. Would he be dangerous to himself or others, in your opinion, if he is released?

Dr. Bunge replied: "I don't believe he would be at this time."

The judge made plain not only his reliance on the offense charged, but also his doubt whether the appellant was mentally ill. He said to Dr. Economon, the only psychiatrist who thought him so:

Do you mean to say, Doctor, that to carry—of course I strongly disapprove of anybody carrying a .45 automatic unless he is in uniform and on duty, and \* \* \* of anybody carrying 500 rounds of ammunition, \* \* \* but, certainly, that is not a symptom of insanity, Doctor, because many sane people do those things.

\* \* \* \* \* \*

You know, we just couldn't accept any psychiatric testimony or theory to the effect that the commission of a crime is a sign of mental disease because if we accepted that our whole system of criminal law would have to break down.

\* \* \* \* \* \*

You practically ask us to take your opinion for the sum total of the tendencies and all the data, instead of enumerating the data so that we could test the conclusion that you reach.

Appellant may not be held in custody for an offense of which he was

found not guilty.[43] Since, as we have pointed out above, he may not be held unless his dangerous propensities "are related to or arise out of an abnormal mental condition"[44] and since the case is being remanded for a hearing and findings concerning treatment, the District Court may reconsider and clarify its findings concerning illness and dangerous propensities.[45]

Reversed and remanded for further proceedings in accordance with this opinion.

FAHY, Circuit Judge.

My purpose is merely to point out why I believe our dissenting colleague is mistaken in saying that we are deciding a case which is not before us.

1. In the District Court the transcript of record has the following statement of appellant's counsel at the beginning of the hearing:

If the Court please, at this time we would like to put on testimony to show that this case falls within Darnell v. Cameron, No. 19043, decided May 28, 1965 by the Court of Appeals here, which indicates that if no treatment is given and St. Elizabeths is used only as a place of confinement, it could be a violation of the petitioner's rights under the Constitution.

\* \* \* \* \* \*

[T]his boy was acquitted on the ground of insanity some, approximately, three years ago. He has been confined to St. Elizabeths as a result of that acquittal on the ground of insanity and I am informed that he has received very little, if any, treatment,

and we have witnesses to show that he is not of unsound mind and he ought not to be kept in St. Elizabeths Hospital, at least John Howard Pavilion, under this short [sic] of maximum security confinement. And, of course, if the Government wants to proceed against him civilly, nobody can stop them from doing that. But as far as treatment is concerned, he is receiving none. He has received very little, if any, and he has served three years, and the offense for which he was acquitted, I think the maximum penalty was one year.

On the next page of the transcript appears the following ruling of the court:

THE COURT: My jurisdiction is limited to determining whether he has recovered his sanity. I don't think I have a right to consider whether he is getting enough treatment or not enough treatment because, after all, treatment of a mental disease ordinarily is only talking to a person. That is what treatment consists of, you know.

MR. EHRLICH [counsel for petitioner]: Well, if the Court please—

THE COURT: Also, I cannot determine whether he should be in one pavilion rather than in another.

MR. EHRLICH: I am not going to ask the Court to determine that. I am saying that failure to accord this accused any treatment at all is a violation of his constitutional rights in keeping him there.

THE COURT: I have to determine whether he has recovered his sanity.

43. It is true, of course, that a jury finding of not guilty by reason of insanity presupposes its conclusion that, aside from the question of sanity, the defendant committed the acts charged. See Rucker v. United States, 108 U.S.App.D.C. 75, 77, 280 F.2d 623, 625 (1960). However, his continued confinement depends not upon the fact that he committed the acts, but upon his present mental condition.

44. Overholser v. O'Beirne, supra note 42, at 269–270, 302 F.2d at 854–855 (1961).

45. The finding that appellant has not recovered his mental health does not allay our doubts since it merely recites a conclusion essentially in the statutory language. Upon conclusion of the hearing below, the government advised the hearing judge that it would submit the "customary findings." They were thereafter submitted and signed by another judge who had nothing to do with the case. When this error was discovered almost two weeks later, the hearing judge signed the findings submitted without change.

Thus counsel raised in the District Court, and the court rejected, the treatment issue discussed in our opinion.

2. . The following appears as the "Statement of Points" in appellant's brief in this court:

Where the record shows that appellant has been confined to a mental institution under D.C.Code § 24–301 since November 9, 1962, upon a finding of not guilty by reason of insanity on a misdemeanor charge and has received no treatment for over the past eighteen (18) months and in fact is not now insane, the trial court erred:

(a) in discharging the Writ of Habeas Corpus and remanding appellant to further confinement with no treatment.

Thus the question was again presented in this court.[1]

DANAHER, Circuit Judge (dissenting).

Since the majority opinion on its face may seem plausible, members of the court who have not seen the record may wonder why I do not join my sitting colleagues. The immediate comment is that they are deciding a case which is not before us.

## I

In the first place, this appellant, as I shall develop, was contending on his pleadings and at trial that he was *not* insane and that he *needed no treatment.* His own expert, Dr. Marland, testified that Rouse was not mentally ill and that he should have been sent to jail in the first place. Appellant's knowledgeable trial counsel, no longer in the case, concluded his *final* argument:

"Mr. Ehrlich: I think the evidence is clear from this [Mental Health] Commission and from Dr. Marland that this patient is no longer dangerous to himself and to others, and I believe

that from the evidence Your Honor ought to release him."

At the outset of the trial appellant's counsel had informed the court that he had witnesses "to show that [Rouse] is not of unsound mind and he ought not to be kept in St. Elizabeths Hospital, at least John Howard Pavilion." So it was that the judge commented as will be mentioned in note 1, *infra.*

## II

Next, my colleagues say they do not *reach* "the question whether the record would have supported a finding of present mental illness and dangerous propensities." By this simple device they undertake to pose as the "principal issues"

"whether a person involuntarily committed to a mental hospital on being acquitted of an offense by reason of insanity has a right to treatment that is cognizable in habeas corpus, and if so, how violation of this right may be established."

But what was the position urged by counsel for Rouse? His *habeas* complaint had alleged that he was being unlawfully detained in

*"that there now exists no necessity for the treatment of the mental condition which led to the acquittal by reason of insanity* and in fact no such treatment has been administered to petitioner for approximately six months." (Emphasis added.)

The "no such treatment" language clearly was mere make-weight in support of his claim that his detention had become incarceration—unlawful because he had recovered and was allegedly entitled to release. His position is emphasized further in that on appeal the appellant poses as the question for decision the following:

"Where one committed under D.C.Code § 24–301, which does not require a

1. Claiming he was sane, appellant sought his complete freedom. This being denied on the ground he had not satisfied the court that he had met the conditions for release specified in Section 24–301 of the

Code, there remained for consideration whether the continued deprivation of liberty at St. Elizabeths was valid without treatment, a question adequately raised by his counsel in both courts.

finding of insanity at the time of commitment, has not been found insane during the three years following his commitment *and evidences to the court that he is not now insane, has no necessity for psychiatric treatment* and has received no treatment for some eighteen (18) months past, is his continued commitment illegal and unconstitutional?" (Emphasis added.) [1]

### III

. Further I think my colleagues disregard our precedents. The trial judge, altogether appropriately, deemed the primary inquiry to be whether or not Rouse had so far recovered from his abnormal mental condition that he would no longer be dangerous to himself or to the community in the reasonably foreseeable future.[2] And certainly, the burden rested upon Rouse to establish his eligibility for release.[3]

So it was that the District Judge made certain specific findings of fact:

"4. The evidence shows that petitioner is suffering from a mental disease, Antisocial Reaction, and would be dangerous. to himself or others if released into the community.

"5. The Superintendent of St. Elizabeths Hospital has not certified to the court that petitioner is eligible for release in accordance with the provisions of 24 D.C.Code section 301(e)."

Additionally the trial judge reached certain conclusions of law. He observed that the petitioner had "failed to sustain the burden of proving his eligibility for · release under the statute," and had not shown that the refusal of the Superintendent to certify .him for release was arbitrary or capricious.

### IV

Just see what we are getting into, especially when we consider the language of our statute, not dissimilar in principle from 18 U.S.C. § 4248. That section provides in pertinent part that

"commitment shall run until the sanity or mental competency * * * shall be restored or until the mental condition of the person is so improved that if he be released he will not endanger the safety of the officers * * * or other interests of the United States." .

Discussing the problem in Greenwood v. United States, Mr. Justice Frankfurter wrote [4]:

"The record shows that two court-appointed psychiatrists found petitioner sane and competent for trial. While the District Court did not accept their conclusion, their testimony illustrates the uncertainty of diagnosis in this field and the tentativeness of professional judgment. The only certain thing that can be said about the pres-

---

1. It is certainly so that as the trial judge sought from counsel an outline of the case he was about to hear, he gratuitously remarked:

    "I don't think I have a right to consider whether he is getting enough treatment or not enough treatment because, after all, treatment of a mental disease ordinarily is only talking to a person. That is what treatment consists of, you know."

    But the appellant was not thereafter or thereby inhibited in any way respecting his treatment; indeed, the treatment afforded him proved so successful that the expert from the Mental Health Commission testified that while at St. Elizabeths, Rouse had recovered his sanity.

2. He acted completely in accordance with the requirements of D.C.Code § 24-301 (1961) and with the pronouncements of

this court in construing the statute. See, e.g., Hough v. United States, 106 U.S.App. D.C. 192, 195, 271 F.2d 458, 461 (1959); Miller v. Cameron, 118 U.S.App.D.C. 323, 335 F.2d 986 (1964).

3. Overholser v. Leach, 103 U.S.App.D.C. 289, 291-292, 257 F.2d 667, 669-670 (1958), cert. denied, 359 U.S. 1013, 79 S. Ct. 1152, 3 L.Ed.2d 1038 (1959). Leach, we held on the Government's appeal, had failed to carry his burden of showing that the refusal of the Superintendent of St. Elizabeths to issue the statutory certificate was arbitrary and capricious.

4. 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956); he also pointed out at p. 374, 76 S.Ct. at p. 415 that a wag had it that " * * * when the legislative history is doubtful, go to the statute." We should do no less.

ent state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment, even about a situation as unpromising as petitioner's * * *."

The judgment of the District Court in *Greenwood* was affirmed, for that court, as was within its proper province, had rejected the testimony of the experts. In our case, the appellant called as his expert one Dr. Marland. He testified that the appellant's "home is not one of poverty, definitely not." The psychiatrist said that Rouse "had several attorneys and several of them have requested me to examine him." The doctor had done so on eight occasions. He found that Rouse

> "suffers from a personality disorder * * * but I do not think that this constitutes mental disease simply because it is in the Diagnostic Manual and since 1950 (*sic,* 1955?) because by fiat, as it were, St. Elizabeths declares it is. I have always contended that personality disorders are not mental disease in the true sense of the term." [5]

The doctor, the appellant's own witness, added that he would take the responsibility of having Rouse released *only* if he were released conditionally, adding

> "I would supervise him."

The judge asked, "In other words, you recommend a conditional release, not an unconditional release?

"The witness: Precisely."

Amply demonstrating [6] the cogency of Justice Frankfurter's observations, *su-*

*pra,* the Government's expert here testified that the appellant was suffering from a personality disorder with antisocial reaction. He explained:

> "This is a recognized mental illness and it is a disorder of the character of the personality."

A person so afflicted shows a preponderance of symptoms which prevents him from making an adequate adjustment in normal living, he added. It became clear, as the judge later brought out from the appellant's expert, that there are two schools of thought among psychiatrists as to whether personality disorders are or are not mental diseases. The appellant's expert specified that at least exhibitionism is "definitely" a mental disease.

The appellant when admitted to St. Elizabeths had told the examining physicians that he had been in difficulty with the law since the age of 14, that "he had had numerous charges on safecracking, housebreaking." The officer in the latest case had arrested Rouse at 1:45 A.M. at 14th and Harvard Streets. Rouse was carrying a suitcase in which were a .45 caliber Colt automatic pistol loaded with seven rounds of ammunition.[7] He also had 100 rounds of .45 caliber bullets, 500 rounds of .22 caliber ammunition, two electric drills, a hacksaw and hacksaw blades.

The Government's doctor may, perhaps, be pardoned for thinking Rouse had displayed little awareness of his function in society and that an antisocial reaction was part of his personality disorder.

5. So my majority colleagues draw upon selected passages from works they name, perhaps never read by more than one or two members of the court. Such references are not of record; they are untested; they were not the subject of cross-examination; they, possibly, have never been accepted by the discipline they purport to reflect.

We as a court are now being asked to utilize such unproved tools in determining first, presumably, what degree of mental imbalance here obtains, and next, whether a particular course of treatment is "adequate."

6. And underscoring our own ineptitude in embarking upon appellate review in this vague area where the "experts" show such divergence.

7. Appellant's expert said Rouse should have gone to jail in the first place, and if he were to be released and thereafter duplicated such conduct, he should go to jail and not be regarded as mentally ill.

## V

So it was that the Government's expert had caused Rouse to receive treatment. He personally saw Rouse at least 20 times on the ward; had talked with him on a dozen occasions, sometimes up to two or three hours; and he finally concluded that Rouse "exhibits frank overt anti-social behavior." A person so situated "can, when he decompensates even more, become schizophrenic." The expert testified that "This man is sick." He believed that Rouse is dangerous to himself and others. If placed at liberty

> "at the present time it would be a precipitous thing to do and he would be dangerous to himself and to other people by virtue of this mental illness. I think he needs supervision over the long haul."

Rouse had participated in group therapy for a total of 50 sessions. He announced to the group on February 16, 1965, "that he was terminating on the 18th. When this premature termination was discussed with him, he stated that he * * * did not want to experience the discomfort that is necessary for change to occur."

The doctor transferred him to an open ward in an effort to induce Rouse to assume normal exposure to other people. "Over and over and over again I have pleaded with him to make attempts to be more comfortable" in an environment "where he will have more privileges." Rouse rejected such efforts and asked to be sent back to the security ward. Rouse had "experienced a great deal of anxiety, panic, nervousness, discomfort. * * * He couldn't tolerate the increasing privileges and responsibility." He had denied himself occupational and recreational therapy, "these obvious pleasures, these obvious benefits, these very therapeutic things which are human things to do, because his anxiety is so great that he can't avail himself of the humanizing influence that exists in this building."

## VI

The judge in view of the conflict between the experts continued the case. He caused an examination to be made by a member of the Mental Health Commission. That expert two weeks later testified that Rouse had been suffering from a mental disorder at the time of his arrest but that he "is no longer suffering from any mental disorder at all." [8] As for future psychiatric care, he testified, "I would like to see him get some supporting help as he reestablishes himself in society."

I think the trial judge correctly concluded: "There is no doubt in the mind of the Court that this patient has improved and that he is continuing to progress." The judge stated that if Rouse demonstrated his capacity to make use of the opportunities afforded him by the hospital, the staff might recommend a conditional release. If not, he added, the "Court would consider a renewal of the application with a view to possibly granting a conditional release." He dismissed the petition "with leave to renew after a reasonable time." [9]

My study of this record has convinced me that the result reached by the trial judge was fully supported. His findings are proof-positive against challenge. His conclusions accord with the objectives of the statute and are entirely consistent with our precedents. Rouse had failed to sustain his burden of proving his eligibility for release under the statute. I think the judgment dismissing the petition should be affirmed, without more.

## VII

Now, my majority colleagues remand "for a hearing and findings on whether

8. If this testimony were to be taken as absolute, would my colleagues say that Rouse had not received "adequate" treatment at St. Elizabeths?

9. And that is exactly in accord with the opportunity this court sitting *en banc*

decided should be available in such situations. Stewart v. Overholser, 87 U.S. App.D.C. 402, 186 F.2d 239 (1950). And see the attached appendix which incorporates the opinion of the trial judge.

appellant is receiving adequate treatment, and, if not, the details and circumstances underlying the reason why he is not." I reject any such disposition as outside the scope of our appellate review function. If some of us are to devise what we say are "issues" upon which to promulgate our views in this highly nebulous area, why should District Judges pay any more attention to what we say by way of dictum [10] than we seem to be according to our own precedents?

Mr. Justice Frankfurter observed:

"Sanity and insanity are concepts of incertitude. They are given varying and conflicting content at the same time and from time to time by specialists in the field. Naturally there has always been conflict between the psychological views absorbed by law and the contradictory views of students of mental health at a particular time." [11]

How cogent his observations! No member of this court has ever suggested that a person committed because of mental illness should not receive "treatment." [12] That this appellant received extensive treatment was overwhelmingly established of record, and so successful had it been, that the Mental Health Commission's expert could say that in his opinion, Rouse had recovered from the mental illness which led to his commitment. Even so, he added as to the need for further psychiatric help, "I would like to see him get some supporting help as he re-establishes himself in society."

Now, where the experts differ so widely on the nature and the degree of the appellant's mental illness, the trial judge is commanded to hold a hearing and prepare findings on whether or not Rouse is receiving "adequate" treatment.

Yet Rouse was really claiming [13] that he no longer was mentally ill.

Once again I suggest the judgment of the District Court should be affirmed.[14]

---

10. See, e. g., Caplan v. Cameron, 125 U.S. App.D.C. ——, 369 F.2d 195 (1966); Holmes v. United States, 124 U.S.App. D.C. 152, 363 F.2d 281 (1966); Hansford v. United States, 124 U.S.App.D.C. 387, 365 F.2d 920 (1966), and compare dissenting opinion, note 11 and related text.

11. Leland v. State of Oregon, 343 U.S. 790, 803, 72 S.Ct. 1002, 1010, 96 L.Ed. 1302 (1952) (dissenting opinion).

12. To the extent that the majority strains to rely upon the "District of Columbia Hospitalization of the Mentally Ill Act," 78 STAT. 944, as amended, an observation or two may be pertinent. That Act was intended to up-date our Code relating to the Commission on Mental Health and the administration of our civil commitment procedures. Not even remotely was it the purpose of the legislation to supplant the provisions of D.C.CODE § 24-301 (1961).

The 1964 Act defined "mental illness" as a psychosis or other disease which substantially impairs the mental health of an individual, and then expressly provided that "the term 'mentally ill person' means any person who has a mental illness, *but shall not include a person committed to a private or public hospital in the District of Columbia by order of the*

*court in a criminal proceeding."* (Emphasis added.)

13. Prior to the instant case, Rouse had twice previously sought his release. In habeas corpus No. 232–64, the second last of his applications, Rouse had specifically alleged that he was unlawfully detained "for the reason that petitioner is now of sound mind and has never in fact been of unsound mind." He further then contended that the Superintendent's refusal to certify Rouse for release was arbitrary and capricious. Judge Hart conducted a hearing, and made findings of fact after Rouse himself had testified. Judge Hart concluded that Rouse was "suffering from an abnormal mental condition, Antisocial Reaction, and would be dangerous to himself or others if released into the community." Rouse did not testify in the instant case.

14. This court's opinion was rendered October 10, 1966. The majority had purported to find a predicate for its result in the "District of Columbia Hospitalization of the Mentally Ill Act," D.C.Code § 21-501 (Supp. V, 1966), 78 Stat. 944. That legislation, the majority noted, had been sponsored in the Senate by Senator Ervin.

In my dissent, footnote 12, I had then noted that the majority "strains" in its purported reliance upon the Mentally Ill

## APPENDIX

The opinion of the trial judge, delivered at the close of the hearing, was as follows:

## OPINION OF THE COURT

THE COURT: There is no doubt in the mind of the Court that this patient has improved and that he is continuing to progress. The only question is whether he has reached a point at which he should be released.

The staff of St. Elizabeths Hospital say no and they support their views by a showing that he refuses to accept opportunities for a greater degree of free-

Act as a prop for the majority conclusion. The legislation not only had defined various terms such as "mental illness" and "mentally ill person," but in so many words had specifically provided that the latter term "shall not include a person committed to a private or public hospital in the District of Columbia *by order of the court in a criminal proceeding.*" (Emphasis added.)

The significance of my reference and my comment perhaps had earlier been unrecognized, for a week later the majority interpolated an amendment designed to meet the effectiveness of my footnote. Our court records show that on October 17, 1966, the majority entered its *sua sponte* order amending its opinion by the interpolation of a new footnote reference "18a." In that amendment, the majority undertook to justify its interpretation of the Mentally Ill Act.

As time has passed, it seems obvious that the majority has become the more certainly aware of the fundamental weakness of its extension of the Mentally Ill Act to the issue here presented.

Thus it is that we find the majority, *sua sponte*, as of April 4, 1967, further amending its opinion by the insertion of footnote 18a, supra, 125 U.S.App.D.C. at ——, ——, 373 F.2d at 454, 455. Hence I add this explanatory footnote 14.

The majority, as will be seen, concedes as it is bound to do, that "The House Committee Report did make the broad statement that the bill applied only to those committed in civil proceedings," but there is more.

My colleagues had correctly noted that Senator Ervin was the sponsor of S. 935, P.L. 88–597, 78 Stat. 944. Testifying in support of that legislation before the House Committee on the District of Columbia on August 10, 1964, Senator Ervin explained that the legislation "is intended to apply to civil hospitalization proceedings. *It has no application to hospitalization arising out of criminal proceedings.*" (Emphasis supplied.) Not only that, but on February 10, 1965 he introduced in the 89th Congress, 1st Sess., S. 1109. That proposed legislation was designed, as he explained to the Senate, to deal with problems arising under section 24–301 of the District of Columbia Code which, as we all know, treats of the subject matter pertinent to "Insane Criminals."

In his statement, having taken note of problems which had arisen under the commitment provisions of section 24–301, Senator Ervin pointed out that "The mandatory commitment law deprives the trial judge who may be the person best qualified to make the decision concerning the hospitalization of the defendant, from exercising any judgment on the commitment issue." He emphasized the hope that hearings on S. 1109 might also afford an appropriate forum for examination of constitutional problems related to criminal cases where the defendant's mental condition is at issue, with particular reference to:

"Whether insanity should be made an affirmative defense in the District of Columbia; and

"Whether provision should be made to provide independent psychiatric assistance to indigents attempting to establish their sanity."*

How my colleagues' amended order can be said to reflect a congressional purpose to apply the provisions of the Mentally Ill Act to persons coming within the scope of D.C.Code § 24–301 is beyond me. Mr. Justice Frankfurter once observed that an interpretation of statutory language by his colleagues amounted to saying that when Congress votes a proposition down, it is the same as saying that Congress has voted it up. As Mr. Justice Cardozo put it, statutory construction should not "be pressed to the point of disingenuous evasion." Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933).

I mention such matters only to suggest that, once again, the Mentally Ill Act according to its express language and in the mind of its sponsor had and has no applicability whatever to commitments under D.C.Code § 24–301. In my view, attenuated circumlocutions appearing in various of this court's opinions concern-

dom within the hospital than he has today and that that hampers and handicaps the staff of St. Elizabeths Hospital in determining or reaching a conclusion that it is safe to release him. I think in that sense he is his own worst enemy.

I was very much impressed by Dr. Bunge's testimony, but I was also impressed at the first hearing by the fact that Dr. Marland, who testified in behalf of the petitioner, did not recommend an unconditional release. He recommended a conditional release. In other words, the physician who testified in his behalf would hesitate to express the opinion that it is safe to release him unconditionally. I think that the petitioner should take advantage, first, of the opportunities of greater freedom in the hospital and, if he shows that he is capable of making use of those opportunities it may well be that the hospital will admit him to conditional release; but even if it does not, the Court would consider a renewal of the application with a view to possibly granting a conditional release. But I do think that he should first cooperate with the hospital and take advantage of the opportunities which they are willing to accord to him for greater freedom within its walls.

Writ discharged and petition dismissed, with leave to renew after a reasonable time.

---

ing problems of criminals who are or may be mentally ill have carried our courts so far afield that it is time for a change.

I add only that in my view Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) in no way applies either to the circumstances of this case or to the pertinent sections of the District of Columbia Code.

> *In Senate Report No. 31 to the 90th Congress, 1st Sess., appears the report of Senator Ervin as chairman of the Subcommittee on Constitutional Rights. He there pointed out that at the previous session, the Congress had adopted the Hospitalization of the Mentally Ill Act. His report continued:
>
> "Due to Subcommittee concentration on the *civil aspects* of this issue, no

hearings were held on S. 1109, a bill dealing with the rights of the *mentally ill in criminal cases*. Senator Ervin, the sponsor of the original measure, plans to introduce this legislation again in the First Session of the 90th Congress. It is anticipated that hearings will also be held on this aspect of the rights of the mentally ill." (Emphasis added.)

It is reasonable to assume that Senator Ervin, a former Justice of the Supreme Court of North Carolina, was quite aware of the two aspects of the problems of the mentally ill, one dealing with civil phases, and the other with the problems of the mentally ill in criminal cases. For my part, I think he knew what he was talking about.